## Bower v. The State.

1. Indictment for murder. The only question before the court was, whether a new trial was improperly refused? On reviewing the evidence before the jury, the majority of the court thought the jury well justified in finding it a case of "wilful, deliberate and premeditated killing," and consequently falling within our statutory description of murder in the first degree.
2. What constitutes "wilful, deliberate and premeditated killing" within the meaning of our statute?
3. The legal rule, that a prisoner's confessions are to be taken altogether, does not mean that the jury should give the same degree of credence to every part. On the contrary, they may well disregard such parts as are inconsistent with reason or other proof.
4. EDWARDS, Judge, dissented. An indictment for murder in the first degree, must charge the killing to have been "wilful, premeditated," &c.; and the evidence sufficient to convict, must establish each of these incidents to the crime; the burthen of the proof of malice falling on the State, and never (as in England,) to be presumed. The judge, after reviewing the evidence on these principles, concluded it insufficient to warrant the finding of the jury.

*Cole*, counsel for appellant:

The indictment in this case contains two counts for the murder of Thompson, alias George Thompson, and the offence is charged in the language of the statute. On the trial of this cause, there were eleven witnesses examined on the part of the State with regard to the facts connected with the offence, and two other persons were examined as to the confession of Bower. Independent of Bower's confession, there was no proof that the dead body found was that of George Thompson, or the person seen with Bower at Madame Rousseris. The prosetor must have failed, therefore, in the absence of this

MAY TERM,
1838.

Bower
v.
The State.

proof—2 Stark. Evi. 945; but his confessions were introduced as evidence on the part of the State, and were considered as sufficient to warrant his conviction. I will proceed to examine the soundness of this conclusion. The law, with regard to confessions, is this: that the whole of the confession must be taken together, for, says the books, (1 Phill. Evi. 88; 4 Taunt. 245,) the admission of a fact against himself shall not be received without receiving, at the same time, his assertion of a fact favorable to him, not merely as evidence that he made such assertion, but admissible evidence of the matter thus alleged by him in his discharge; and if there is no evidence incompatible with the confession, it must be taken as true, and further, that a prosecutor shall not call witnesses to impeach the credit of any thing that has been said by his own witness—Arch. Crim. Plead. 121; 2 Gilbert's Evi. 891. In this case the prosecutor made Bower a competent and credible witness on the part of the State, and neither attempted to impeach, nor could impeach, the verity of his statement. His position, therefore, is that of a competent and credible witness, who was present at the killing of Thompson, who knew all the parties, and is cognizant of all the facts and circumstances of the transaction about which he is called to testify, and that he has told them truly. This witness states in substance as follows: "that Forbes, Bower and Thompson came to Herculaneum together, and there parted under an agreement to come together again at the forks of the road about two miles from Ste. Genevieve, that they accordingly met there, that so soon as they met together, Forbes and Thompson began quarreling and fighting, that Forbes took a stick out of Bower's hand and knocked Thompson down, that Thompson jumped up and struck Bower on the head and cut his hat in the crown, then Bower, with a small stick, struck Thompson two blows on the back, and no more, and Forbes continued to strike deceased until he was dead, and jumped on his breast with his heels after he was dead, and then took and dragged him into the gully, where they stripped him, and Forbes took Bower's pantaloons in exchange for deceased's pantaloons, to keep from being known; that Forbes and Thompson had quarreled before, and that was the cause of their separation, that they had killed the man and were sorry for it, that Forbes threatened to strike Bower down if he did not strike Thompson, that he did strike him only two blows with a cane, that Bower did not kill Thompson, that Forbes told Bower if he would

knock Thompson, they would go to Orleans together."
This is the substance of the confession of Bower.

Having thus ascertained the facts of the case, all that
remains is to apply the law. Murder is an offence defined by statute; the killing must be wilful, deliberate and
premeditated; all these are material to be alleged in the
indictment, as descriptive of the offence, either in substance or in the language of the statute itself, and must
be proved on the part of the State, otherwise the prosecution must fail—Mo. L. 167. Those averments are of
the essence of the offence. Murder is an offence created
by statute, and the inference of malice does not arise under this statute from the mere fact of killing, as at common law—2 Hale's Pleas Cr. 170; Arch. Crim. Plead.
23; 1 Chitty's Crim. Law, 232, 16, 281, 557–9. The
rule under that law is, that malice is an inference of law
from the fact of killing, if there was no legal excuse
shown by defendant—2 Gilb. Evi. 880. This inference
can only arise under this statute when all the constituent parts of the offence, as defined by statute, have been
proved on the part of the State, and without this, the
supposition of law does not arise that the accused should
be punished with death.

In order to convict Bower then, it was necessary on
the part of the State to prove, first, that Bower killed
Thompson; second, that the killing was wilful; third,
that it was deliberately done; and fourth, that the crime
was premeditated. With submission, the evidence in the
cause does not prove these facts; the witnesses introduced by the State, negative those averments in the indictment, and surely the doctrine of presumption cannot be
allowed to overthrow facts in favor of the State, where
the State would not be permitted to impeach their credit
by witnesses—2 Gilb. Evi. 891. However, I will say a
word as to the application of circumstantial evidence to
this case. A presumption is, where some facts being proved, another follows as a natural or very probable consequence from them, so as readily to gain assent from
the mere probability of its having occurred without further proof. The fact thus assented to is said to be presumed.

Presumptions are violent, probable, or rash; the latter
have no validity at all. How shall we apply this doctrine to the present case? Here we have all the facts
proved by a competent, credible eye-witness. There is,
therefore, no ground for a legal presumption to be deduced from. Suppose it was asserted that there was a le-

gal presumption deducible from all the facts of this case, that Bower had murdered Thompson? I would, with submission, ask how can that be? for by such a proceeding you set aside facts·that have a legal existence, and supply their place, in a case of life and death, by imaginary facts that have no legal existence. This would be to supersede a negative fact, clearly proved by an affirmative fact, not proved at all. It would be analagous to the verdict of a jury finding a person guilty of felonious homicide, when the evidence on trial clearly proved that the accused was not guilty. I have not considered the mass of testimony given in this case on the part of the State for the purpose of proving Bower guilty from circumstances, because Bower's confession was the last evidence given to the jury in point of time, and was a tacit admission, on the part of the State, that the previous testimony before the jury was insufficient to maintain the indictment, and because presumed facts deduced from this evidence, and contradictory of facts as detailed in Bower's confession, could not be considered·by a court of justice as legal evidence in the cause. It follows, therefore, that the circumstantial evidence in the cause, can only be received as evidence when it is found corroborative of Bower's confession, and not when it contradicts those confessions; and that inasmuch as those confessions, taken all together, do not prove him guilty of the crime alleged in the indictment, he is entitled, under the law of the land, to a reversal of the judgment of the circuit court, and new trial. It may be added, also, that, if the State, by contradictory evidence, has created a doubt whether Bower be guilty or not, he is entitled to the benefit of that doubt.

*Zeigler*, counsel for defendant:

The defendant's counsel contends that the circuit court erred in refusing to grant a new trial: 1. Because the evidence did not warrant the verdict of·"guilty of murder in the first degree," as rendered by the jury in this, that there was no evidence to show malice on the part of the prisoner; the whole matter, from the entire evidence, is involved in doubt and uncertainty; nothing but circumstantial evidence was introduced, (except the confession of the prisoner,) and that of such a nature as clearly comes under the denomination of light or rash presumptions; that the inference, drawn from the facts stated by witnesses, were not such as would *necessarily* follow those facts, and consequently the jury were not

justified in rendering the verdict which they did, and for the same reason the court erred in refusing to grant a new trial.

2. There was no evidence (other than the confession,) that the deceased came to his death by the hands of prisoner.

3. There was no evidence that sufficiently identified the deceased to be the person last seen in company with the prisoner, other than the confessions of the prisoner, which according to law, are confessions which are, that the whole of a confession must be taken together, if introduced by the prosecutor—Roscoe, 41. And, says Chief Justice Bosanquet, the whole of a confession must be taken together. The prosecutor cannot select one part and leave another; and also, that if there be no other evidence in the cause, (which is the case here,) or no other evidence incompatible with it, the declarations so adduced in evidence, must be taken as *true*; and if, after the whole statement of the prisoner is given in evidence, the prosecutor is in a situation to contradict any part of it, he is at liberty to do so—Common Law Reports, vol. 12, p. 292, Rex v. Jones. And then the statements of the prisoner and the whole of the other evidence, must be left to the jury precisely as in other cases, where one part of the evidence is contradictory to another—Rex v. Claus, p. 354; Com. Law Rep. vol. 19; Roscoe, 42. The counsel for the prisoner contends that there was no evidence whatsoever, that in any respect contradicted the statements of the prisoner; but on the contrary, the whole evidence actually corroborates the statement of the prisoner, and consequently the statements of the prisoner, according to the sound meaning and law, must be taken as true; and if so taken, cannot, according to the statutes of this State, convict him of wilful murder; that from all the circumstances taken together, they could not possibly amount to more than the crime of manslaughter.

4. The court erred in refusing to grant a new trial, because the verdict of the jury was manifestly contrary to the instructions of the court on the law of confessions, and because the jury evidently did not take into consideration such parts of the confession as were in favor of the prisoner, but could only have taken such parts as were against him, although the whole confession was corroborative of, and consistent with the entire residue of the evidence, and therefore, should have been duly considered, and have had its full weight in making up the

verdict according to the true rule and spirit of the law regulating such evidence.

5. The court erred in refusing to grant a new trial, because the confession of the prisoner was improperly introduced, and should not have gone to the jury, because the same was made under the belief that he was to be executed the next day, and consequently was not that free and voluntary confession which the law requires it to be, in order to make it evidence for or against the prisoner—Roscoe, p. 29; 1 Leach, 263, in Warnaksall's case.

6. The court erred in refusing to grant a new trial, because the whole transaction, from beginning to end, is involved in so much doubt and uncertainty, and the possibility so great that the prisoner may be innocent of that wilful and premeditated killing required by our statutes to constitute the crime of murder, as clearly to bring the present case under that humane rule of law, as laid down by McNally, in vol. 1, page 3, on the subject of doubt.

And lastly, counsel for the prisoner contend that the common law doctrine, (that malice is implied in every killing,) has been changed by our statute, and that the malice, in order to constitute the crime of murder, must now be clearly shown by the counsel for the State, and is no longer implied, which the State has entirely failed to show or make out in the present case; and from the confessions of the prisoner, which are the only evidence in relation to the immediate killing, it is evident that the whole affair was the offspring of passion and heat of blood, which clearly reduces the present case to manslaughter, if not to justifiable homicide—Roscoe, 555–6. Therefore, from the whole facts and circumstances of the case, the counsel for the prisoner contend that the judgment of the circuit court was contrary to law, and that the said judgment should be reversed, and the cause remanded back for a new trial, or the prisoner entirely discharged according to the statute, (page 449, sec. 12,) as to this court shall seem proper and just.

*Brickey*, counsel for appellee:

This case seems to present but two material points or questions for the consideration of this court: 1. Was the evidence here preserved sufficient to warrant the jury in finding the defendant guilty of the offence charged in the indictment? 2. Did the circuit court decide correctly in overruling the motion of the defendant for a new trial? An affirmative answer to these two questions must settle this case.

1. The evidence was all-sufficient to warrant the jury in finding the defendant guilty. The whole of the testimony, taken together, comes under the legal definition of, 1st, " circumstantial;" 2d, "confessions," of the accused.

I contend that circumstantial evidence alone is often sufficient to satisfy a rational mind of the existence of any fact without positive proof. Evidence is that which demonstrates, makes clear, and ascertains to the jury the truth of the very fact or point in issue to be tried either on the one side or the other—McNally's Evi. p. 2. Circumstantial or presumptive evidence should always go to the jury, especially on a trial for murder, which is frequently committed in secrecy; therefore, such evidence should be received—McNally's Evi. p, 678; 1 Stark. Evi. p. 432, to pp. 433, 434, 435, 436, 46; 4 Blk. Com. p. 359; Archbold, p. 76, 77.

I am aware it is not necessary to refer this court to so many authorities on this point, because the doctrine will hardly be controverted by the opposing counsel, and it only remains to apply the evidence before this court to the legal principles above laid down. With regard to the circumstances developed, there is not one particle of contradictory or inconsistent evidence given by any one witness; but a most singular concurrence and corroboration of each and every one of the witnesses, as well as the circumstances proved. The defendant and the deceased were seen together, and slept at the same house, in the same bed, the evening preceding the murder. They left there next morning, inquiring the way to Ste. Genevieve, only four or five miles distant. Defendant was seen to take a cudgel from the wood pile, too large for a walking stick. They were met by two men the same morning, within two miles from Ste. Genevieve, on the main road to town, and again inquired the way, and passed the witnesses, going towards town. In about two hours, the same two witnesses, returning a short distance, say two hundred yards from where they had met the parties, discovered much blood in the road, and saw where something had been dragged out of the road; the witnesses followed the trail some one hundred or one hundred and fifty yards, and found the body of the deceased in a gully, stripped naked, all covered with blood, and the head mashed or broken. These witnesses went on to town, and gave information, &c. There was found by the dead body, the hat and some other pieces of clothing of the defendant, as well as the

club or stick before spoken of, and the defendant gone. The same evening the defendant is seen by several witnesses going back on the road from Ste. Genevieve in the direction of St. Louis; staid all night at Dr. Kluke's, where his conduct and demeanor was observed to be unusual; left Kluke's next morning, took off the road in another direction, and was found some eight or ten days afterwards at the Dutch settlement. Several witnesses identified the clothes of the deceased on the defendant when he was apprehended, and especially the cap, which was particularly described by the witnesses, as well as several other pieces of clothing. Defendant told some of the witnesses he was going to St. Louis, but left the road and went in another direction. On his arrival at the Dutch settlement, the same day he left Dr. Kluke's, where he had staid the night before, he informed the witnesses he had been lost and had slept out in the woods the night before, &c. &c.

Here is the substance of the circumstantial evidence, (without any positive proof of the killing and murder,) which was submitted to the jury; and surely this evidence alone was all-sufficient to warrant the jury in finding the defendant guilty of the murder charged in the indictment, according to the rules and principles of the law before in the authorities referred to. But if any doubt can exist as to the guilt of the defendant upon this evidence, this court will proceed further to consider the other or second branch of the evidence, to wit: the confessions of the defendant, as deposed to by two witnesses.

That the confessions or admissions of a criminal are legal evidence against him and proper to go to a jury, is clear from abundant authorities—see 2 Stark. Evi. p. 27, and note 9; also, 28, 30; 1 Stark. Evi. p. 42, 43; Archbold, 73, 75, 76, 77; also, McNally's Evi. p. 40, 51, 52; 2 Bac. Ab. 663; 4 Blk. Com. p. 356, 357, 359. It appears, then, by the testimony of Zeigler and another witness, that the defendant confessed and admitted to them on more than one occasion, while he was in jail, that he was present when the deceased was killed; that he had the club or stick described by other witnesses; that he had stricken the deceased two blows; that he assisted in dragging him from the road where he was murdered, and also in stripping the clothes off the deceased; and all this voluntarily and freely without any threat, duress or compulsion, or any promise or other inducement whatever, which brings the confessions exactly within the law to make them evidence to go to the jury. It

is true the defendant at the same time spoke of another individual by the name of Forbes, who he said made the assault and attack upon the deceased, and actually killed him; but his statement in this particular, with regard to Forbes and the circumstances connected with his account of Forbes, was not, nor could not have been credited by the jury. Indeed, upon a minute examination of this part of the story, no one can give any credence to it; and if they could, so as to raise any doubt of the defendant's guilt, the jury, (who tried the cause, had the witnesses before them, heard all the arguments of the counsel, and whose duty it was to weigh the whole of the evidence,) by the very fact of their finding the defendant guilty, have negatived the truth of this part of the defendant's statement, as well they might by every principle of law—see 1 Stark. Evi. p. 417, 322; Archbold, 100; NcNally, 548. The jury, then, are the exclusive judges of the facts in all cases; the court decides the competency of a witness, but the jury always judges of and decides upon his credit. Here, then, the whole of the defendant's confessions and admissions, for and against him, were given to the jury. They considered the whole of the evidence, as was their duty, and came to the irresistible conclusion that the defendant was guilty of "wilful, deliberate and premeditated murder." There was no objection made to any one decision made by the circuit court, except overruling the defendant's motion for a new trial. From all the evidence, as appears by the record, I cannot see on what ground the circuit court could have granted a new trial. The possibility that a man by the name of Forbes, mentioned by the prisoner, could have left him, and the deceased at Herculaneum, his being absent from them three days, travelling another road in the direction of the mines, should suddenly meet the parties at the forks of the road near Ste. Genevieve at the instant the murder took place, kill the deceased in the manner described by the defendant, make his escape, and never be heard of before or since, is too remote to be believed by any one; and again, if Forbes was the real murderer of Thompson, why did not the defendant go on to Ste. Genevieve and give information? Why change his course and turn back towards St. Louis, the road they had just travelled in the morning, and tell some he was going back to St. Louis, and others he was going to the Dutch settlement in another direction? And when he arrived there, why did he say he had laid out all the preceding night because he was lost,

when in fact he had come but a few miles from Doct. Kluke's? The fact of the clothes of the deceased being found upon him, especially the cap, shoes and coat, and the defendant's hat and the club or stick being found by the body of the deceased, would seem to be conclusive; but when the voluntary confessions are also taken in connection with these circumstances, all doubt and uncertainty seem to vanish, and any rational mind is brought to the same conclusion with the jury. Hence, it would appear, the circuit court did not err in overruling the motion for a new trial; but merely decided the law of the case, as it should have done, and gave judgment accordingly.

MAY TERM,
1838.

Bower
v.
The State.

McGIRK, Judge, delivered the opinion of the court.

At the April term of the circuit court for the county of Ste. Genevieve, Bower was indicted by the grand jury of that county for the murder of one George Thompson. The trial was had at the said term; the defendant pleaded not guilty, and a jury found him guilty on both counts in the indictment; both are alike, except one is in the common law form; the other is in the common law form, but contains, also, certain words in a late statute regarding the crime of murder. The prisoner, by Messrs. Cole, Zeigler and Rezier, of counsel, moved in arrest of judgment and for a new trial, which were overruled, and the court gave judgment of death on the prisoner, to be executed on the 9th day of June ensuing. The prisoner has brought the case here by appeal. Something is said in the record about wrong instructions, but that matter has not been showed at the bar, nor does the record show any thing about that matter.

The only question for the consideration of the court is, whether or not the circuit court erred in refusing a new trial? The question has not been argued on the motion to arrest the judgment, nor can I perceive any reason why any notice should be taken of it.

The reasons for a new trial are, that the verdict is against law and evidence, that it is against the weight of evidence. The evidence on the part of the State was in substance as follows: That on the last day of January, 1838, the prisoner and one Thompson, or rather, (to use the words of the witness,) that the prisoner and a young man staid at the house of witness, Mrs. Roussiere, all night, took supper and breakfast, and left her house after breakfast for Ste. Genevieve. The witness lives

Indictment for murder. The only question before the court was, whether a new trial was improperly refused? On reviewing the evidence before the jury, the majority of the court thought the jury well justified in finding it a case of "wilful, deliberate and premeditated killing," and consequently falling within our

MAY TERM,
1838.

Bower
v.
The State.

statutory descrip-
tion of murder in
the first degree.

about five miles on the road from Ste. Genevieve to St. Louis; both had blue roundabouts; prisoner had on black pantaloons; does not recollect the color of the pantaloons of the other person; prisoner had on a white hat with a black ribbon round it; the other man had on an old fur cap; when they left her house in the morning, prisoner picked up or had a large stick in his hand. The hat produced in court, witness says, is the hat prisoner had on when at her house. The witness identifies the cap brought in court which the other person had on when at her house; describes the buttons of the coat of the other person as being yellow in the middle, and black round the rim, and says those shown in court are the same. These persons came to her house after dark; had but little to say; prisoner never spoke to the other man that evening; is a German, and speaks but little English; both slept in the same bed; next morning the prisoner spoke of his sore toes; that the two appeared friendly in the morning; the prisoner paid fifty cents for his bill, said it was all the money he had, and the deceased said to prisoner, "John, we have to pay the woman 74 cents for our lodging and eating," which was paid. The deceased was a young man, had no beard, pale complexion, about 16 or 17 years of age, his hair was a little redish. The witness saw a corpse eight days thereafter, which had hair of the same color as the person at her house, and did not recognise him by any thing else. Louis Roussiere, a boy, and son of the last witness, says prisoner and a young man, an American, came to his mother's, herein as stated above, and next morning when they went away, saw the prisoner have a stick. Saw a corpse eight days after; that the corpse he saw had hair the same color as the prisoner's companion; that he knew the corpse by nothing but the color of the hair; describes the buttons as described by his mother; that the men came to his mother's in the night, and left next morning after breakfast.

Felix Dufour says, on the morning of the first of February, he went from Ste. Genevieve with his cart for wood on the road leading from Ste. Genevieve to Potosi, and toward St. Louis; he met two men going on foot towards Ste. Genevieve, near the forks of said road, and about two miles from Ste. Genevieve; the witness went and got his wood, and was gone from that place one hour and a half, and about two hundred yards from the place where he met the men, he saw where something had been dragged across the road, and thought it was a deer; that he followed the trail about fifteen or twenty steps

beyond the road, and found the dead body of a man in a gully, stripped of all his clothes, except socks and shirt; the day was cold, but the blood was not frozen; thinks the hat and cap in court are the same the stranger had on; the stick of ash shown in court is the same he saw by the dead body; the hat shown in court the same he found by the dead body; says he did not recognise the dead body.

Henry Morris says, that on the morning of the first of February, he met two strangers on the road, near the place, or about two hundred yards from the place where he found the dead body, one man a little stouter than the other; the largest man was walking behind the other with a stick under his arm; that he came back with Dufour and saw a trail across the road, supposed it was made by dragging a deer across the road; followed Dufour and found a dead body of a white or pale complexion; the same was naked, except socks and shirt, and was covered with leaves; the breast was blue from strokes, and the skull was mashed in; and that the body was about two hundred yards from the place where he met the two men; that he did not recognise the dead body, and that he does not recognise the prisoner. It appears that the place where the dead body was found, is near or about two miles from Ste. Genevieve, on the Potosi and St. Louis road, near the forks; and that Madame Roussiere lives on the St. Louis road, about three miles farther towards St. Louis.

Louis Roussiere swears he went out to cut wood on the road, the other witnesses speak of, on first February, and saw no person in the road, came back with them, saw a small dead man in the gully near the road.

Pierre Labourin says he lives eight miles from Ste. Genevieve, on the St. Louis road; that on the same day the man was found dead in the gully, the prisoner came to his house about twelve or one o'clock, and took dinner, and said he was going to Dr. Kluke's; started towards Kluke's; had on a little cap and blue roundabout; said he was a blacksmith; the cap in court looks like the cap prisoner had on at his house, if not the same; the man's pantaloons were black and torn; the man was lame.

John Drury, a witness, says that on the same day the man was found dead, the prisoner came to his house about sundown, was walking and was lame, and ate supper, and left his house in about half an hour, went towards Kluke's, and the next morning saw same man coming towards town.

MAY TERM, 1838.

Bower
v.
The State.

Jas. Capon says, that on Tuesday, late in the evening, he saw the prisoner one half mile from Dr. Kluke's; he asked the way to Ste. Genevieve; was in company with a small spare made man, light hair; both had blue round-abouts on; the prisoner had on a white hat, and black ribbon on it; the small man had light hair, and an old fur cap; the witness identifies the hat.

Dr. Kluke says, on the first day of February, the prisoner came to his house after sundown, staid all night, had a sore toe, appeared lame, was distressed and scared, witness thought from pain and lameness, and the prisoner looked as if something was wrong, and did not sleep that night; told the witness he was lost all day; ate breakfast, and started back towards Ste. Genevieve; the witness identifies the cap in court to be the same the prisoner had on at his house.

Austin Follert says, that on Tuesday, the second of February, at two o'clock, the prisoner came to his house; that he lives six miles from Ste. Genevieve, and seven from Dr. Kluke's, and one mile from the Potosi road; the prisoner staid there half an hour, and he did not speak to him at all.

Joseph Rein saw the prisoner at Follert's at 2 o'clock; the prisoner told him he came from St. Louis; told the witness he staid in the woods all night and was lost, and started for Ste. Genevieve.

Martin Zokest says, about 2 o'clock on the second day of February, the prisoner came to his house, said his name was John Bower, said he came from St. Louis and was going in the country; the prisoner remained at his house eight days, when he was arrested for murder by the sheriff of Ste. Genevieve county.

Louis Van Voert says he had a conversation with the prisoner in jail. The prisoner said he came from St. Louis in company with two men, and that they pursued their road together as far as Herculaneum; and that the person with him, the deceased, took another road from the other person, and that they were to meet again at a cross road near Ste. Genevieve, about two miles from town; that the prisoner described the road or place of meeting to witness, and said he knew it because he had travelled that road before; that when the prisoner and the deceased got to the road or place of meeting, they stopped a short time and saw their companion coming down the road; that after a little conversation, they commenced quarreling; that after the deceased and the other man had quarrelled a little while, they began to

scuffle and fight; the other man took the club the prisoner had in his hand, and knocked the deceased down; and after the other man had knocked the deceased down, this third man (whose name was called Forbes by the prisoner) gave the prisoner the club, and told him if he did not strike the deceased, he would knock him down, and being thus forced into matters by threats, he then struck the deceased twice with the club. The body of Thompson, the deceased man, was then dragged into a gully. The witness then says, two or three days after he had the above conversation with the prisoner, the prisoner again told him the same story, with this difference, that he had struck the deceased with a cane and not with the club; and that the Englishman, Forbes, (as he called him,) told him that if he would knock Thompson, they would go to N. Orleans together. The prisoner said he did not kill Thompson, that he only gave him two blows.

Sebastian Ziegler says, a few days after the prisoner had been in jail, the prisoner sent the sheriff to him to go and see him; he did so, in company with the sheriff; when he went, he found the prisoner crying; then the prisoner told him that some person through the grates told him he was to be hung to-morrow; and that he was in a bad fix, and wished he had not been with them men; and said there were three in company, to wit: John Bower, (himself,) George Thompson, (the deceased,) and Thomas Forbes; and that five of them had broken jail at St. Louis; that the three mentioned had travelled together as far as Herculaneum; that Forbes then took the big road, and he and Thompson came to Fight's shot tower, and then continued on down, when, after being separated two nights, the third morning they all came together again. The prisoner and Thompson came to the forks of the road, stopped about 10 or 15 minutes, looked up the big road, and saw Forbes coming. The prisoner then said, "if he only could live a little longer to save his soul, if he could not save his life." Then the prisoner confessed that they had killed the man; and said he was very sorry he was along; and said after they left Madame Roussiere's, they stopped at the forks of the road, and that Forbes came down the road, and so they came together; the quarrel again commenced, having quarrelled before, which was the cause they parted; that Thompson and Forbes had quarrelled in the St. Louis jail, where Forbes drew a knife on Thompson; and that after a little quarrelling at the forks of the road, Forbes took the stick

out of prisoner's hand, and knocked Thompson down, when the deceased jumped up and knocked the prisoner on the head, and cut the crown of his hat; then the prisoner took the small stick and gave the deceased two blows on the back, and no more; while prisoner was doing this, Forbes continued to strike Thompson till he was dead, and jumped on his breast with his heels after he was dead; that Forbes then took and dragged Thompson into the gully in the woods, and he went along with him; and while there, Forbes told prisoner they must change clothes, and they began to strip Thompson, he having the best pantaloons; Forbes tried to put on Thompson's pantaloons, but could not, he being a much larger man than Thompson; then the prisoner and Forbes changed pantaloons to keep from being known; Forbes then said he would take the road to Perryville, and he should take another, but he being lame could not travel far or fast; the prisoner told witness he wished Forbes might be caught, and said he could not be far off, as it was such cold weather; then prisoner gave a particular description of Forbes, which was minute; then asked witness if he would be hung, to which the witness replied, he must be tried first by a jury. The witness had several conversations with the prisoner, and the prisoner always told the same tale as to the facts; asked him for prayer and religious books, and cried a great deal.

Doctor Shaw, a witness, says he saw the dead man in the gully; helped to take him out; his skull was broken, also cut in the forehead, and the breast very much bruised. This was all the evidence given for the State, and the prisoner gave none.

It is contended by the prisoner's counsel, that the evidence is insufficient to sustain the verdict against the prisoner as to murder in the first degree. They, however, do not insist that there should have been a verdict of acquittal entirely, but that the confession made by the prisoner establishes the guilt in the second degree of murder only; and they insist that the jury must have erred in giving due weight to that part of the prisoner's confession which goes to show the prisoner was compelled to take part in the transaction by threats of Forbes. In order to show what was the duty of the jury regarding this confession, they have cited several authors, which, if necessary, will be noticed hereafter. The indictment is founded on the first section of the second article of the statute respecting crimes—Revised Code, 167, and enacts that "every murder which shall be committed by

MAY TERM,
1838.

Bower
v.
The State

means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed murder in the first degree." The second section says, "all other kinds of murder at common law, not herein declared to be manslaughter, or justifiable or excusable homicide, shall be deemed murder in the second degree." The third section declares that "persons convicted of murder in the first degree, shall suffer death; and those convicted of murder in the second degree, shall be imprisoned in the penitentiary."

The first section places all those murders which are done by means of poison or by lying in wait, in the first rank of the catalogue; it then declares that all other *murders*, where the killing is wilful, deliberate, and premeditated, shall also stand in the first degree. These words furnish a general description of murders which are to be known by the description; and all those which answer the description are, when known by the description, to be placed in the first degree; as well as those embraced in the particular description. All those contained in the particular description, we know are not intended to be in the general description. These are the following: 1. Those committed by means of poison. 2. Those committed by lying in wait. 3. Those committed in the perpetration or attempt to commit arson. 4. Those committed in the perpetration or attempt to commit rape. 5. Those committed in the perpetration or attempt to commit robbery. 6. Those committed in the perpetration or attempt to perpetrate burglary. 7. Those committed in the perpetration or attempt to commit any other felony. Then the special cases end with a general description of other felony as to the attempt or perpetration of crimes. I understand, that not only the six cases specially given are in the first degree, but that all the cases which occur or can be found, when the murderer is perpetrating or attempting to commit any manner of felony, are also in the first degree. There is no evidence in the case at bar that Bower's case comes within any of the specially enumerated cases.

To place his case, then, in the first degree, the murder must have been wilful, deliberate and premeditated. All three of these things must concur, if, indeed, they do constitute three distinct ingredients. But I do not perceive how it can be so. I understand *deliberate* and *premeditated* are in this case about the same thing. I will,

What constitutes "wilful, deliberate and premeditated killing" within the meaning of our statute?

therefore, drop one of these words, and use the other as being sufficient. The statute says, the killing must be wilful; by this I think the act means the murderer intended to kill. This supposes an actual condition of the mind in regard to the killing when the deed takes place. The other part of the description requires that the killing must have been thought of before the act of killing began to take place.

The legislature, therefore, say the killing must be premeditated. I therefore understand the description of murder, required to place it in the first degree, to be this: "that there must be a killing with an intent to kill and do the deed at the time the fact took place; and also that before the act took place, the murderer intended to do the deed." Before I compare the prisoner's case with the statute as above understood, I will remark that, as regards the cases put by the statute in the second degree of murder, they are all those which are not contained in the first section, and all of those not otherwise provided for by the act. I at first, when the argument began, thought there was nothing on which the statute (second section) could act. But I now think that there may be several classes of murder on which it can act. I will not now inquire whether the statute has placed all those murders, not in the first degree, on the footing of manslaughter, justifiable and excusable homicide, but will simply say, that there are several murders at common law, which do not come under the general description of the first degree. The first case is, where the unnatural mother exposed a child in an orchard, which was in consequence destroyed by a kite. The next is, where the overseers of the poor neglected and refused to furnish food for a beggar, and he died. The third is, where a son wantonly exposed his sick father to the weather, so that he died. At common law, all these cases would be murder—see 4 Blk. Com. p. 197. Now, in all these cases, there is no supposition that the party exactly intended to commit the act of killing, yet because the consequence was death, the party was holden to be a murderer. These cases, therefore, and the like cases, are in my opinion, the cases which are within the second degree.

I will proceed to examine the case at bar, on the evidence, to see if the jury erred in finding the prisoner guilty of murder in the first degree.

In the first place, it is to be remembered, there must have been a murder. I do not doubt at all that, independent of the confession, the proof is entirely satisfactory

that a murder was committed on the body of Thompson; and that that murder was of a wilful and deliberate character, sufficient to rank it in the first degree.  The proof is, that on the night preceding the homicide, the prisoner and the deceased staid all night three miles from the spot where the homicide occurred; that though they appeared friendly while there, yet the prisoner (says the witness, Mrs. Roussiere,) took with him in his hand a big stick; they were both walking; the prisoner was lame, and complained of his lameness while there.   Now one might suppose the stick spoken of was intended to be used as a staff, but the witness says the stick was big; presently the prisoner and the deceased were met by a witness, who found them walking, Thompson before, the prisoner behind, with his stick under his arm.   This took place near the scene of the murder.   The fact that the prisoner did not use the stick as a walking stick, and that he had it under his arm, does strongly indicate that the stick was not taken at first to be used as a walking stick.   Another witness says he saw the parties within two hundred yards of the spot where the dead body was found.   The witnesses, as they came back with wood, found a trail across the road; followed the trail across the road, and in about twenty yards from the road, found a dead man in a gully, stripped of all his clothes, except socks and shirt; they also saw the dead man had been beaten with a club, his skull mashed in, his breast bruised, and the hat of the prisoner and the club, which Bower was seen with just before, lying near the dead man; the cap and other clothes of Thompson were gone, and afterwards the cap of Thompson, the first time Bower was seen, was on his head, which was the same day about twelve or one o'clock; the prisoner then was found pursuing the back road which he had come, and at night was found at Dr. Kluke's, 12 or 14 miles from the scene of the homicide; there he appeared alarmed and scared, and slept none; pretended he had been lost, yet, in two instances that day, he had means of inquiring the road to Kluke's, and did so inquire; he then was, the next day, found at the distance of 7 miles from Kluke's at night; said he had been lost and lay out the night before; he might have been lost that day, but that he lay out the night before we, see by the testimony of Kluke, was entirely false; eight or ten days thereafter he was arrested. Here we find a man has been killed, and the question is, who did the deed?   Can any thing be more clearly proved who did it, than the circumstances in this case do

prove Bower did it? Yes, positive proof might be more satisfactory. Yet, in my opinion, the jury risked nothing to consider the evidence sufficient. They might well suppose the stick carried by the prisoner from Madame Roussiere's was taken with the intention to kill Thompson, as it was not used for any purpose of convenience. This same stick was seen also under his arm, when within two hundred yards of the scene of the murder, and it was also found at the spot where the body was found. In the ordinary course of things, who could have done the deed with this stick other than Bower? Then we find Bower's hat there, the very hat seen on him two hours before within two hundred yards of the spot. Then the cap of the dead man was that same day seen on Bower's head. If Bower did not kill Thompson, how came the hat and stick there? This cannot be accounted for on any principle other than by supposing that Bower killed Thompson with the stick, hid him, left his hat, and took Thompson's cap for the purpose of disguise, and being so disguised, perhaps safe in his opinion, he took the back track. There are many other circumstances to strengthen this opinion, such as pretending to be lost and lying out all night, his behavior at Kluke's, and the like. If the foregoing view of the evidence proves Bower committed the murder, it does, in my mind, also prove that the murder is of the first degree. If Bower did the act at all, the fact of the stick being carried three miles, and the evidence of bruises and the skull being mashed in, proves wilfulness and premeditation, so that the case comes within the general description of those murders placed in the first degree. That the stick was used, the appearance of the body, the skull beat in, the breast and head bruised, abundantly prove this; that the killing with this stick was premeditated before the killing took place, is proved by the fact where the prisoner got the stick, how he carried it, &c.

But it is said, his confession being given in evidence, must be taken altogether. This is the law. But it is also the law, that the jury may give credit to one part of the confession, and totally disregard the balance. This is not a new arbitrary power, but must be governed by rational legal principles. One of those principles is, that if that part of the confession which goes for the prisoner is against the experience of mankind, then it is of no weight. If it be contradicted by other evidence stronger than itself, then it has no weight. If the whole confession is contradictory to itself, then it is of no weight.

The legal rule, that a prisoner's confessions are to be taken altogether, does not mean that the jury should give the same degree of credence to every part. On the contrary, they may well disregard such parts as are

If the facts proved by a witness are totally or partially inconsistent with the whole transaction, or a material part thereof, then the same is of no value; and just so, if that part of the confession going for the prisoner is so, then its credit is nothing. If the statement of the prisoner is at different times different, the value of the whole is lessened.

If we try the confessions in this case by these rules, his confessions will not help him out. The case the prisoner makes out by his confessions, first to Van Voert and then to Zeigler, is, that himself, the deceased, and one Forbes, broke the St. Louis jail; in company they travelled to Herculaneum; that Thompson and Forbes quarrelled, and for that reason parted; that Forbes took one road and they another; that it was understood and agreed they should meet again at the forks of the road, where the killing took place; that after being parted two nights, the third day in the morning, Bower and Thompson came to the spot, and in about 10 or 15 minutes, Forbes came also. In the first place, this coincident meeting, though not impossible, is rather improbable. That as soon as Forbes came up, Thompson and himself began to quarrel, and a scuffle ensued between them. Then Bower tells Van Voert that Forbes took the club that he had in his hand, and therewith knocked Thompson down; and that after Forbes had done so, he (Forbes) gave the prisoner the club, and told him if he did not strike Thompson, that he would knock him (the prisoner) down, and being thus forced into matters by threats, he then struck the deceased twice with the club. The prisoner again told the same story, except that he said he struck the deceased with a cane and not the club, and said he did not kill Thompson. In regard to this confession, it undertakes to put Bower in a condition of necessity to strike Thompson twice.

It seems to me there is no truth in the pretence. The prisoner says Forbes took the club from him, knocked Thompson down, and then gave the club back to him, and then threatened to knock him down if he did not strike. In the first place, Forbes had no club when the fight began; if he had, why take Bower's stick? Then he had none after he gave it back to Bower, and he was in no condition to knock Bower down; so that the pretence of duress is all a pretence, for Bower would hardly have given the deceased two blows with the club for fear of Forbes, when Forbes was unarmed and he him-

MAY TERM,
1838.

Bower
v.
The State.

inconsistent with reason or other proof.

self was armed; I therefore conclude there is no truth in this part of the matter.

The next time the prisoner talked with Van Voert, he stated he struck the deceased with a cane. This puts the club back in the hands of Forbes, and does away entirely with the duress; but gives as inducement to Bower to strike Thompson, that if he would do so, they would go to New Orleans together. The confession of the prisoner to Zeigler is, that when the quarrelling had advanced, Forbes took the stick out of his hands and knocked the deceased down with it; that Thompson jumped up and knocked prisoner on the head, and cut the crown of his hat; then the prisoner took a small stick and gave the deceased two blows on the back, and no more. This account of the fight is an improvement on the former account, for, in this the prisoner had a good provocation to strike the deceased, and in the former there was no such thing, but duress at first and then a promise to travel together. In this case the stick is never returned to Bower, but while Bower was so striking Thompson, Forbes continued to beat him till dead, then stamped the dead man's breast with his heels; then goes on the confession about changing clothes.

It seems to me this confession cannot be a true account of the matter; because, first, no such man as Forbes has been heard of. If such man had been found, that fact might have helped the prisoner some.

In the second place, the account is not entitled to credit, because, if Bower were innocent, and one Forbes had committed the murder, as stated, when the two parted, if Bower were really innocent, he would have given information to the first person he could have found; he would have went to Ste. Genevieve, only two miles off, which he knew according to his statement, for he says he had come the road before, and have made the matter known, so that Forbes might be caught. But instead of this, he puts on a disguise, took the back track, told lies, and wandered about.

I am well satisfied the jury did right to reject his confession entirely, and particularly that part which seeks to mitigate his crime. Judgment affirmed, Judge TOMPKINS concurring.

EDWARDS, Judge, dissenting.—I do not concur with the other judges in the opinion just delivered in this case. By the law on which this indictment is founded, every murder committed, either, 1, by *poison*; 2, by *lying in*

wait; 3, in committing arson; 4, rape; 5, robbery; 6, burglary; and 7, in committing any other felony, shall be deemed murder in the first degree. The indictment under this act, for any one of these murders, must charge the particular manner of the killing; if by "poison," it must be so charged; if " by lying in wait," it must be so charged; if in attempting to " perpetrate arson," it must be so charged; and so of the other cases specially enumerated. The proof must correspond with the charges in the indictment, and the prosecutor must make that proof, and must show that the killing was done in the particular manner charged. If charged to have been done by "poison," the prosecutor must prove it to have been done by " poison;" if charged to have been done by "lying in wait," the prosecutor must prove it to have been done "by lying in wait;" and so of the other cases. The same section which declares these specially enumerated cases to be murder in the first degree, provides, also, that every murder committed " by any other kind of wilful, deliberate and premeditated killing," shall be deemed murder in the first degree. For a murder of this character, the indictment must charge it to have been " wilful, deliberate and premeditated." The proof must here correspond with the charge also, and must show that it was "wilful, deliberate and premeditated." As when the indictment charges the murder to have been by " poison," it is necessary to prove it to have been done by " poison;" so, also, when the indictment charges it to have been " wilful, deliberate and premeditated," under the same law, it is necessary to prove that the killing was " wilful, deliberate and premeditated." The poisoning is a principal ingredient of one murder in the first degree, and it must be proved when charged; and the wilfulness, deliberation and premeditation, are principal ingredients of another murder of the first degree; and when charged, for the same reason, must be proved also. At common law, where the homicide is established, the law implies the malice, and the prosecutor is not bound to prove it; but the defendant must show the absence of malice, a thing as difficult for him to prove in many cases, where really there was no malice, as it would be for him to prove his innocence of the charge against him, in many cases, where he was really innocent; and a thing which is about as reasonable in the law to require him to prove, as it would be, if he were charged with murder, to require him to prove the murderer's innocence. But the common law does, in its thirst for vengeance,

MAY TERM, 1838.

Bower
v.
The State.

degree, must charge the killing to have been "wilful, premeditated," &c.; and the evidence sufficient to convict, must establish each of these incidents to the crime; the burthen of the proof of malice falling on the State, and never (as in England,) to be presumed. The judge, after reviewing the evidence on these principles, concluded it insufficient to warrant the finding of the jury.

where there has been a killing, (to use a strong expression,) in some cases imply malice, where really no malice existed, rather than lose an occasional subject where malice did exist. I think our law intended to remedy this hardship. In my view of this part of our statute, malice cannot be implied, and the defendant is not bound to prove the absence of malice; but the prosecutor is bound to prove that the killing was "wilful, deliberate, and premeditated." By the term "wilful," it may be understood that the killing was *designed*, and not by accident; by "deliberate," that it was done after reflecting and weighing the matter well; by "premeditated," nearly the same thing, but a larger and greater degree of deliberation, or, rather, a determination beforehand to do the act. When the murder is not proved to be "wilful, deliberate, and premeditated," it must fall within the second degree of that offence, unless it has been declared to be manslaughter, or excusable or justifiable homicide. The case before us was not one specially enumerated in the act referred to, but comes under the description of "wilful, deliberate, and premeditated" killing; and as the killing was not proven to have been "wilful, deliberate, and premeditated," in my understanding of the evidence, the defendant should have been found guilty, not of murder in the first, but of murder in the second degree, if the evidence was sufficient to justify that finding. I am of opinion, therefore, that the judgment of the circuit court ought to be reversed, and that the cause ought to be remanded.