THE STATE OF KANSAS v. WILLIAM BROWN, *et al.*

1. INDICTMENT FOR MURDER IN THE FIRST DEGREE, *What it must Charge.* In an indictment for murder, where the indictment does not charge that the killing was done by means of poison, or by lying in wait, or in the perpetration or attempt to perpetrate any felony, the indictment must charge that the killing was done deliberately and premeditatedly, in order to make the same a good indictment for murder in the first degree.

2. INDICTMENT FOR MURDER, *When not for Murder in the First Degree.* Therefore, where an indictment for murder charged substantially that the defendant deliberately and premeditatedly committed an assault and battery upon the deceased, by shooting him with a pistol loaded with gunpowder and leaden balls, and thereby inflicted a mortal wound, from which mortal wound the deceased died, but did not anywhere charge that the defendant committed the assault and battery, or did the shooting or killing with the deliberate and premeditated intention of killing the deceased, *held*, that the indictment did not charge murder in the first degree.

3. INDICTMENT FOR MURDER, *When not Insufficient.* Where an indictment for murder charges that the killing was done by John Taylor, William Brown, and Thomas Craig, by shooting the deceased with pistols and revolvers, such indictment is not insufficient because it alleges that "said pistols and revolvers the said John Taylor, William Brown and Thomas Craig then and there in their right hands held," when they did the shooting.

4. REBUTTING EVIDENCE; *In Case Stated, What may be Shown.* Upon the trial of a criminal case, where the defendant is charged with murder, and the evidence tends to show that at the time of the killing the deceased was under arrest upon a charge of killing certain Indians, and of stealing property belonging to Indians, and some of the evidence tends to show that the deceased was killed by Indians, and not by the defendant, and the prosecution introduced evidence tending to show that the Indians did not at the time of the killing believe that the deceased was guilty of killing their comrades, or of stealing their property, but believed that he was innocent thereof, *held*, that the defendant may, as rebutting evidence, show that the Indians must have believed that the deceased was guilty of killing their comrades and of stealing their property; and, for the purpose of doing this, he may show the acts and confessions of the deceased, in the presence of the Indians, when he was charged with killing the said Indians and stealing the Indians' property.

5. CONVERSATION; *Part of Shown, Remainder thereof may be Shown.* Where the prosecution in a criminal case introduces evidence showing a portion of a certain conversation had between the defendant and a third person, the defendant may introduce evidence showing the rest of such conversation.

### Appeal from Greenwood District Court.

INDICTMENT for murder, charging John Taylor, *William Brown* and Thomas Craig with the felonious killing of William Bledsoe and Jacob Bledsoe, at the county of Greenwood, in April, 1865. *Brown* was tried at the May Term, 1878, of the district court. The jury returned a verdict of guilty of murder in the first degree. The defendant was sentenced in accordance with the above verdict, and from this judgment and sentence he now appeals to this court.

*Cates & Keplinger*, for appellant:

We know the court is trying Brown, and not the Bledsoes; nevertheless, a knowledge or belief on the part of the Indians that the Bledsoes had murdered Indians, is, when taken with the other circumstances, evidence tending to show that it was Indians and not Brown who killed the Bledsoes.

We had a right to show any fact whatever which, in its nature, would be likely to have exasperated the minds of the Indians against the Bledsoes. An oral communication would be quite as likely to produce this result as a physical act perceived by the eye. A word might be no less effective than a blow. The tendency of a fact to exasperate the Indians against the Bledsoes, and not the particular sense through which it was perceived, was the true test of its admissibility. And yet the court below rejected as hearsay, fact after fact, of the most exasperating nature, merely because they reached the minds of the Indians through the medium of the ear. For the benefit of the counsel for the prosecution, we now solemnly reiterate what we repeated so often in the court below: We are trying to establish the *mere fact* that such-and-such statements were made, and not to establish the *truth* of those statements.

To show that the foregoing observations are pertinent to the case, we call attention to the record:

The state claims that defendant was acting in concert with the parties who killed the Bledsoes; also, that the defendant

alleged it was Indians who killed them. Cottingham, first witness for the state, testified that a few days before the Bledsoes were killed, they, together with one Matthews, were under arrest, charged with killing Indians a few days before; that several hundred Indians were present near where the Bledsoes and Matthews were under arrest; that he, witness, heard defendant make a contract with the Indians, by which the latter were to kill the Bledsoes in consideration of the sum of fifty dollars to be paid them by defendant; that Matthews turned state's evidence and told where the bodies of the murdered Indians might be found; that after this the Bledsoes expected to be killed, and requested the father of the witness, who was a preacher, to pray for them, and that he did so in the hearing of the Indians, after which the Indians were pacified and manifested no further disposition to harm the Bledsoes.

One Pinney also testified for the State, that he was at defendant's house at the time the Bledsoes were killed; that he heard firing in the direction of where the bodies of the Bledsoes were found next morning; that soon after, defendant came in and stated that the Indians had attacked and killed the Bledsoes.

Mrs. Loveland, formerly wife of one of the Bledsoes, and Mrs. Baxter, both testified to dying declarations of one of the Bledsoes, charging the defendant with having actually participated in the act of killing.

1. The defendant, in his opening statement, stated that he would show that a short time before the killing of the Bledsoes, they, together with one or two other parties, had killed some Indians and taken a large amount of property belonging to the Indians; that the Bledsoes were arrested therefor; that the stolen property was identified and reclaimed by the Indians; that Matthews made a confession in the presence of the Bledsoes that the charge was true, and told where the bodies of the murdered Indians were thrown into the river; that this confession was made in the presence of the Indians, and that the Bledsoes admitted their guilt; that the Indians

became very hostile, and manifested a disposition to wreak vengeance upon the Bledsoes; that to prevent them from being killed by the Indians, they were removed from place to place; that some whites and Indians visited the place where Matthews said the bodies of the Indians had been thrown into the river, and found confirmation of Matthews's statement; that while defendant was acting in good faith, seeking to remove the Bledsoes to a place where they would be secure from the contemplated attack of the Indians, the latter attacked and killed them.

And thereupon defendant placed one Cantrell upon the witness stand, and offered to prove almost every one of the facts alleged in the opening statement for the defense, and was not permitted to do so.

We call particular attention to the fact that we were not permitted to show the precise nature of Matthews's confession, and that the Indians had full knowledge of the confession — a fact not shown by the testimony of Cottingham. Also, that we were not permitted to show the conduct of the Bledsoes when charged by Matthews, in the presence of the Indians, with having murdered the Indians.

And defendant offered to testify that he was present at the time spoken of by Matthews, and heard the Bledsoes, in the presence of the Indians, confess that they (the Bledsoes) were guilty of having murdered the Indians, but the court refused to allow him to do so.

Allen Thomson testified that he was one of the guards at the time the Bledsoes were killed; that they were killed by a party of fifteen or twenty — that party certainly, and he thinks all of them, were Indians.

And defendant offered to prove that one Johnson, who was also under arrest with the Bledsoes upon charge of killing Indians, in the presence and hearing of one Hickox, made a confession in the presence of the Indians, charging the Bledsoes with having killed Indians, and told where the bodies of the murdered Indians were thrown into the river, and that search being made at the point designated, the Indians

found what they considered satisfactory proof of the truth of Johnson's statement, and that they became thereby greatly incensed and enraged against the Bledsoes.

Also, that, a few days later, Matthews made a similar confession, without any knowledge of Johnson's confession, and designated the same place as the point where Johnson stated the bodies of the murdered Indians were thrown into the river; and the court refused to and did not permit this evidence to be admitted, and stated that all such evidence was wholly immaterial.

And afterward, defendant offered to prove other matters by said witness, upon which the state withdrew all objection to the evidence of this witness, and said he might go on and tell all he knew about anything — he might tell all he knew about the last war, if he wanted to; and thereupon the court stated, in the hearing of the jury, that the witness "might proceed if counsel for the state was willing, but that such testimony was wholly immaterial and could have no bearing in the case."

Defendant declined to allow the witness to proceed, upon the ground that it would be useless to introduce evidence which the court had just told the jury would be wholly immaterial, and would therefore be disregarded by them.

2. The court erred in refusing to allow Brown to testify as to the information he had received from Redmond, a few moments before the killing of the Bledsoes.

Pinney had testified for the state, that the same evening the Bledsoes were killed, Redmond, who lived four miles down the river, came and called defendant out, and told him he wanted him to go and see his (Redmond's) sick child; that defendant came back into the house, put on his hat and coat, seemed excited, and started off without his medicine; that on his attention being called to the fact, he stated that he would not need it; that thereupon defendant and Redmond rode off together; that about an hour after, twelve shots were heard in the direction of where the Bledsoes were found dead next morning; and that soon after, defendant re-

turned and stated that, as they were removing the Bledsoes away from Baxter's, they were attacked by Indians, and the Bledsoes were killed.

And afterward the defendant came upon the witness stand, and offered to testify that when Redmond came and called him out, he informed him that a large body of Indians were in the neighborhood for the purpose of killing the Bledsoes, but the court refused to permit him to do so. This was manifest error. The action of the defendant, as testified to by Pinney, might be suspicious; but his acts, taken in connection with the information he had just received from Redmond, would be entirely consistent with defendant's claim that he was simply doing all in his power to protect the Bledsoes from the revenge of the Indians, and secure for them a fair trial under the law of the land. This evidence was also objected to, and ruled out on the "popular" ground that it was "hearsay evidence." The truth, or falsity, of what Redmond told Brown was not in issue, which of course would have been hearsay; but that Redmond did make certain communications to Brown, and that Brown acted upon these communications in the belief that they were true, is not hearsay, but original evidence. If Brown acted upon this information, whether true or false, his motives were alike good. This testimony having been excluded, it was natural that the jury should impute to the defendant a motive consistent with Pinney's testimony, viz.: that he sought the Bledsoes for the purpose of taking, and not for the purpose of saving their lives, as claimed by the defense.

3. The court erred in refusing to allow defendant to explain why he failed to bring water to the wounded Bledsoes. Under ordinary circumstances, a refusal to carry water to a man wounded and dying, would be such an act of heartless atrocity as of itself to be certain proof of a murderous heart. Under other circumstances, it might be an act of the most ordinary prudence.

The defendant admitted the fact, but was not permitted to show a most ample and sufficient excuse for his conduct. He

offered to show that the Indians were still near at hand, and that he expected them to return at once and scalp the Bledsoes, and offered also to show good reasons for apprehensions as to his own safety, should they find him there. The testimony of the state on this point tended to prejudice the minds of the jury against defendant.

4. The court erred in overruling the defendant's motion for a new trial. The verdict of the jury is contrary to law. The indictment does not charge murder in the first degree. For a definition of murder in the first degree, we refer to the instruction of the court in this case:

"In order to constitute murder in the first degree (as applicable to this case), a design must be found to kill *willfully*, that is, on purpose, with the intent that the act by which the life of a human being is taken shall have that effect; deliberately, that is, with fixed purpose; *maliciously*, that is, with malice aforethought; and with premeditation, that is, the design must be formed before the act by which the death is produced is performed."

By referring to § 6, ch. 31, Gen. Stat. 1868, we find that killing, in order to constitute murder in the first degree, must be by poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing. Tested by these definitions, the indictment is wholly insufficient to sustain a verdict of guilty of murder in the first degree.

The indictment charges everything to have been done willfully, deliberately and premeditatedly, save and except the killing.

The allegation that "by the manner and means aforesaid" the defendant did kill and murder, does not constitute a charge of murder in the first degree, unless the statement of the manner and means mentioned embraces every essential ingredient of murder in the first degree. There is nothing in the statement of manner and means which involves a purpose or intent to take life, or to cause a wound of the nature stated.

To append to a statement of facts constituting a charge of manslaughter the allegation that *by the manner and means*

*aforesaid* the defendant did kill and murder, would not constitute a charge of murder in the first degree. (1 Kas. 388.)

*H. C. Rizer*, county attorney, and *Clogston & Martin*, for The State:

The court did not err in refusing to permit the defendant to introduce evidence showing the bad feeling entertained by the Indians against the Bledsoes a short time before the killing. "Evidence may be given in any action of the existence or non-existence of any fact in issue, and of any fact relevant to any fact in issue, and of no others. The judge may exclude evidence of facts which, though relevant to the issue, appear to him too remote to be material under all the circumstances of the case." (Stephens's Digest of the Law of Evidence, ch. 2, art. 2.)

Now, in this case, the fact in issue was the guilt of the defendant of the murder of the Bledsoes. Suppose the defendant had been able to show that five hundred people, for as many different causes, entertained feelings of hostility toward the deceased: how could such facts be made "relevant to the fact in issue" in this case?

The fact which counsel for defendant desired to introduce was not in issue, neither was it "so connected with the fact in issue as to form part of the same transaction or subject-matter." (Stephens's Digest of the Law of Evidence, ch. 2, art. 3.)

The court did not err in refusing to permit Brown to "testify as to the information he had received from Redmond a few moments before the killing of the Bledsoes."

The court did permit defendant to state what he did after receiving Redmond's communication, but did not permit him to state what Redmond told him.

If the theory of the prosecution be correct, viz., that all the parties, Redmond included, were acting in concert that night, bent on taking the lives of the Bledsoes, then any declaration made by Redmond to the defendant privately could not be introduced. If the theory of the defense be correct, the proof of the statement made by Redmond would

not have been relevant to establish it. The statement made by Redmond sought to be introduced through the witness Brown, would not have been admissible if coming direct from Redmond himself, had he been placed on the stand.

The court did not err in refusing to allow defendant to state, as a part of his reasons for not bringing water to the wounded Bledsoe, other instances and circumstances, as a reason; but the court did permit him to state that he expected the wounded man to be dead in a very short time, which he gave as his reason.

There was no error in overruling the defendant's motion for a new trial. The indictment charges that the defendants "did then and there unlawfully, feloniously, willfully, wickedly, deliberately, premeditatedly, purposely and maliciously, with certain pistols and revolvers," etc.— what? Why, "gave to the said William Bledsoe one mortal wound, . . . of which mortal wound the said William Bledsoe, on the 2d day of April, 1865, died; and thereby gave to the said Jacob Bledsoe one mortal wound, . . . of which mortal wound the said Jacob Bledsoe died instantly." The concluding clause charges that the defendants, "him, the said William Bledsoe, and him, the said Jacob Bledsoe, in the manner and by the means aforesaid," etc. It would have been sufficient to have concluded the indictment by adding, after the word "aforesaid," the words, "did kill and murder." The essence of the crime is set out in the first part of the body of the indictment, and need not have been repeated in any particular. Under our statutes, the "contents of an indictment shall be the title of the action and a statement of the facts constituting the offense, in plain and concise language." (*Smith v. The State*, 1 Kas. 389; Gen. Stat., ch. 82, § 103.)

"While it would doubtless be sufficient to follow the language of the statute in charging a crime, it is not necessary so to do. It is enough if the language used, according to its ordinary and natural meaning, states clearly an offense within the statute, according to the same manner of interpretation." (*The State v. White*, 14 Kas. 539.)

The language of the indictment, taken together, clearly imports that the killing was willful, deliberate and premeditated. It matters not where the allegation of "willful, deliberate and premeditated killing" appears in the body of the indictment. It sufficiently charges the defendant under our statutes. If taken together, the language of the indictment clearly imports that the killing was willful, deliberate and premeditated. (*Smith v. The State*, 1 Kas. 389.)

But take the concluding clause of the indictment as it stands. It is true, the word "deliberate" is not included, but "according to the ordinary and natural meaning of the language used" it clearly charges the crime of murder in the first degree. The language is, that the defendants named in the indictment, the said Bledsoes, "in the manner and by the means aforesaid, unlawfully, feloniously, willfully, wickedly, purposely, maliciously, and with malice aforethought, did kill and murder." Malice aforethought is defined as meaning "deliberate premeditation." 2d Bouvier's Law Dictionary, 98; title, *Malice*, 3.

Aforethought is defined by Webster to mean, "premeditated; prepense; as, malice aforethought." The same authority defines premeditate to mean, "to think, consider, or revolve in the mind beforehand; to *deliberate.*" And again, deliberate, "to balance in the mind; to weigh; to consider." Bouvier says: "Premeditation differs essentially from will, which constitutes the crime, because it supposes besides an actual will, a *deliberation* and a continued persistence which indicate more perversity. Thus, in using the term, "malice aforethought," all the meaning carried by the word "deliberate" is incorporated. Hence, it is plain that the language used in this indictment, "according to its ordinary and natural meaning, states clearly an offense within the statute."

The opinion of the court was delivered by

VALENTINE, J.: This was a criminal prosecution. The defendant was tried, convicted and sentenced as for murder in the first degree; but he claims that it was done erroneously,

as the indictment upon which he was tried did not charge murder in the first degree, but at most, only murder in the second degree. We are inclined to think that the defendant is correct. The indictment is probably sufficient as an indictment for murder in the second degree, but we hardly think it is sufficient as an indictment for murder in the first degree. It does not charge that the killing was done by means of poison, or by lying in wait, or in the perpetration or attempt to perpetrate any felony; nor does it charge that the *killing* was done *deliberately* or *premeditatedly*. It was intended to be an indictment charging a deliberate and premeditated killing, but it failed in charging the deliberation and premeditation. It charges that the defendant, William Brown, and two others (John Taylor and Thomas Craig), killed two persons (William Bledsoe and Jacob Bledsoe) with pistols and revolvers; but it does not charge that they did the killing with any deliberate or premeditated intention of killing the deceased. The deliberation and premeditation charged in the indictment do not go to the killing, but merely go to the acts which finally and eventually resulted in producing death. Stripping the indictment of everything except that which might be supposed to charge deliberation and premeditation, and changing it so as to make it an indictment against the defendant alone for killing one of the Bledsoes with one pistol, and it would read substantially as follows: The defendant

1. Indictment, not good for murder in the first degree.

deliberately and premeditatedly, with a pistol charged with gunpowder and six leaden balls, which pistol he in his right hand held, of deliberate and premeditated malice, did shoot against the body of Bledsoe, and thereby gave to Bledsoe one mortal wound, of which mortal wound Bledsoe died; and the defendant him the said Bledsoe,"in the manner and by the means aforesaid, unlawfully, feloniously, willfully, wickedly, purposely, maliciously, and with malice aforethought, did kill and murder." The first part of the indictment charges substantially that the defendant deliberately and premeditatedly committed an assault and battery upon Bledsoe by shooting him with a pistol

loaded with gunpowder and balls; but it does not charge that the defendant at the time had any deliberate or premeditated intention, nor indeed any intention, of killing Bledsoe. It substantially charges that he deliberated upon and premeditated the shooting, the assault and battery, but it does not charge that he deliberated upon or premeditated the killing. From anything appearing in this part of the indictment, the shooting and the assault and battery may have been committed with the intention merely of wounding Bledsoe, either severely or slightly. There was nothing in the mode of killing that would authorize even the slightest inference that the defendant ever entertained a deliberate or premeditated design, or any design, to produce death. The indictment does not show whether the pistol was large or small, whether the balls were large or small, whether there was much or little gunpowder in the pistol, nor on what part of the person of Bledsoe the wound was inflicted, or intended to be inflicted. Of course, the failure to state these things does not render the indictment insufficient; but we mention them merely for the purpose of showing that this part of the indictment does not even inferentially state that the killing was done deliberately or intentionally. The latter part of the indictment we have quoted, *verbatim*. While it alleges that the defendant " unlawfully, feloniously, willfully, wickedly, purposely, maliciously, and with malice aforethought, did kill and murder" Bledsoe, yet it does not allege that he did it either deliberately or premeditatedly. If this part of the indictment had charged a deliberate and premeditated killing, then, under the authority of *Smith v. The State*, 1 Kas. 365, the indictment would have been sufficient as an indictment for murder in the first degree. But as neither this nor any other portion of the indictment charged that the killing was done with any deliberate or premeditated design to kill, or by means of poison, or by lying in wait, or in the perpetration or attempt to perpetrate some felony, the indictment cannot be considered as a good indictment for murder in the first degree. (*State v. McCormick*, 27 Iowa, 402; *State v. Watkins*, 27 Iowa, 415;

*Bower v. The State*, 5 Mo. 364; *State v. Jones*, 20 Mo. 58; *State v. Reaky*, 1 Mo. Appeal, 3; *Fouts v. The State*, 8 Ohio St. 98; *Kain v. The State*, 8 Ohio St. 306; *Hagan v. The State*, 10 Ohio St. 459; *Loeffner v. The State*, 10 Ohio St. 599.)

The indictment in this case charged that the killing was done by John Taylor, William Brown, the present defendant, and Thomas Craig, with pistols and revolvers, "which said pistols and revolvers the said John Taylor, William Brown and Thomas Craig then and there in their right hands held." The defendant now, and for the first time, claims that the in-

*Indictment, not insufficient.*

dictment is insufficient, because, as he claims, three men could not hold pistols and revolvers in their right hands and inflict therewith a mortal wound on each or either of two different persons, and cites, as authority therefor, *The State v. Gray*, 21 Mo. 492, and *The State v. Steeley*, 65 Mo. 218. The authorities he cites are not in point. There is certainly nothing impossible in three men holding three or more pistols or revolvers in their right hands and therewith inflicting wounds, and the authorities quoted do not say that there is. It would not even be impossible, however improbable it might be, for three men to hold one and the same pistol or revolver in their several right hands, and therewith to inflict a mortal wound, and therefore no court could properly hold that an indictment charging such a thing would necessarily be insufficient. (*Coates v. The People*, 72 Ill. 303.) Besides, our statutes provide that "any person who counsels, aids or abets in the commission of any offense may be charged, tried and convicted in the same manner as if he were a principal;" (Gen. Stat. 839, §115;) and as construing this kind of statute, see case last cited.

The defendant claims that the court also erred in excluding certain evidence offered by the defendant. The killing was done in this case on April 1, 1865, in the southern part of Greenwood county, on what was then the Osage Indian reservation. Several hundred Indians were at that time camped in the vicinity of where the killing was done. The theory

of the defendant is, that the killing was done by the Indians from revenge, because, as they believed, the Bledsoes and others acting with them had killed several Indians, and had stolen a large number of ponies and other property belonging to the Indians. The defendant was present at the time the killing was done, and immediately afterward stated that it was done by Indians. There was also evidence in the case showing directly and positively that Indians were also present at the time the killing was done, and that the killing was done by them. The state introduced a witness by the name of Cottingham, who testified among other things as follows:

"He (Cottingham) was at Brazil's trading-post some eight days prior to the time the Bledsoes were killed; that the Bledsoes were then under arrest, charged with having killed some Indians and taken from them some horses and other property; that there were several hundred Indians camped at said Brazil's post at the time; that witness saw defendant and others talking to the Indians at that time *and offering them money and property if they would kill the Bledsoes;* that the night afterward one Matthews under arrest with the Bledsoes, charged with being guilty of the same offense with which the Bledsoes were charged, turned state's evidence, and told where the Indians (the Bledsoes were charged with killing) had been thrown into the river; and that after Matthews turned state's evidence, some one told the Bledsoes if they had anything to say they had but a few minutes to say it in; that the Bledsoes were afraid the Indians were going to kill them; that they wanted some one to pray for them; that the father of witness who was a preacher did pray for them, and that immediately after *the excitement all quelled down, and that the Indians manifested no further disposition to injure the Bledsoes; that they said if the whites wanted such men killed, they might kill them themselves, that they, the Indians, would not kill innocent men.*"

This evidence was evidently introduced for the purpose of showing—1. That the defendant had a desire that the Bledsoes should be killed; and 2. That the Indians had no such desire; that the Indians believed that the Bledsoes were "innocent men;" that they had not killed Indians nor stolen Indian ponies or Indian property. The defendant offered to rebut this testimony by introducing other testimony, showing

that the Indians could not have believed that the Bledsoes were "innocent men;" but the court below ruled it out. Said other testimony was as follows: The defendant introduced a witness by the name of Cantrell, who testified among other things that he was present at the time that Matthews made his said confession, and that he had the Bledsoes in his charge. The defendant then offered to prove by this witness that "at the time Matthews confessed and stated in the presence of the Indians and the Bledsoes, that he (Matthews) and the Bledsoes had murdered the two Indians for whose murder they were under arrest, and had thrown their bodies into the river at a point designated by said witness, and that one of said Bledsoes then said to Matthews, 'You did not tell us not to kill them,' and that Matthews replied, 'Yes I did, by God—you know I did,' and that thereupon said Bledsoe sank back on a seat and covered his face with his hands and remained silent." But the court refused to allow this evidence to be introduced.

The defendant also introduced himself as a witness, and offered to testify that he was present at the time that Matthews made his said confession; "that there were a great many Indians present, and that the Bledsoes then confessed they had recently been guilty of murdering Indians." But the court refused to permit him to so testify.

We think the court below erred in excluding this evidence. It was certainly proper rebutting evidence. If it was competent for the state to show that the Indians had no motive or desire to kill the Bledsoes, it was certainly competent for the defendant to show by rebutting evidence that they had such a motive. If it was proper for the state to show that the Indians believed that the Bledsoes were "innocent men," and had done the Indians no harm, it was certainly proper for the defendant to show that the Indians could not have believed so, and that they must have believed that the Bledsoes killed some of their comrades and stole some of their property; and proof of the acts and confessions of the Bledsoes in the presence of the

4. Rebutting evidence; what may be shown.

Indians at the time that Matthews confessed, was competent evidence.

The state also introduced a witness by the name of Pinney, who testified, among other things, as follows:

"A short time before the killing was done, Redmond, who lived about four miles down the river, rode up to the defendant Brown's house, called Brown out, who was a physician, and told him that he wanted him to come down to his house to see a sick child; that Brown told him he would go; that he came in, put on his hat and coat, appearing a little excited; his wife told him he was leaving his medicine case; he said he would not need it; that thereat Brown and Redmond rode off together; that about an hour after, he heard twelve shots in the direction of where the Bledsoes were found dead next day; that about three-quarters of an hour or an hour thereafter, defendant returned and said as they were moving the Bledsoes from Baxter's they were attacked by Indians, and the Bledsoes were killed."

The other evidence shows that the defendant, after leaving his own house with Redmond, went to Baxter's, near by where the Bledsoes, who were still under arrest,

5. Conversation: part of, shown, remainder thereof may be.

were kept and guarded, and after some conversation the defendant and the guards with the Bledsoes removed from Baxter's with the intention, as the defendant claims, of going to a place of greater safety, but with the intention on the part of the defendant, as the prosecution claims, of murdering the Bledsoes; and soon after they left Baxter's the Bledsoes were killed by Indians, as the defendant claims, but by the defendant and his assistants, as the prosecution claims.

The foregoing testimony of Pinney was evidently introduced for the purpose of making it appear to the jury that the defendant went to Baxter's under the false pretext that he was going to Redmond's to attend a sick child. For the purpose of rebutting this unfavorable view of the testimony, the defendant introduced himself as a witness, and offered to testify with reference to the whole of the conversation between himself and Redmond had at the time when Redmond "called him out" of his house as aforesaid, but the prosecu-

tion objected, and the court below sustained the objection. The defendant offered to testify that Redmond, in this same conversation, told him "that a large body of Indians were in the vicinity for the purpose of killing the Bledsoes," and that it was this information "which caused him to go at once to Baxter's." But the court excluded the testimony. The defendant "testified that at the time his wife told him he was leaving his medicine he knew he was not going to see a sick child, but was going to Baxter's," and going for the purpose, as he offered to testify, of persuading the Bledsoes to leave Baxter's, and go to a place of greater safety. We think the court below erred in excluding the defendant's evidence. It was simply proof of a part of the same conversation, a part of which the prosecution had already introduced evidence of, and it tended to rebut the unfavorable inference which the prosecution undoubtedly desired the jury to draw from that portion of the conversation which the prosecution had already given to the jury.

Because of the errors above mentioned, the judgment of the district court will be reversed, and a new trial awarded. The appellant will be returned from the penitentiary, and delivered over to the jailer of Greenwood county, to abide the order of the district court of that county.

All the Justices concurring.