The State v. Lowe.

THE STATE v. LOWE, *Appellant.*

1. **Practice in Supreme Court** : VERDICT AGAINST WEIGHT OF EVIDENCE. The Supreme Court will not interfere with the verdict in a criminal case upon the ground that it is against the evidence, unless there is such a lack of evidence as to indicate that the jury acted from prejudice.

2. **Criminal Law** : DRUNKENNESS. Drunkenness is no excuse for the commission of crime.

3. ——— : INSANITY : BURDEN OF PROOF : PRACTICE. Where insanity is the result of some temporary cause, as an attack of sickness, or the like, there is no presumption of such insane condition continuing. But, an habitual, permanent, or chronic state of insanity being shown to exist, its continued existence will be presumed, and the burden of establishing a subsequent lucid interval at the time of the commission of an act, either civil or criminal, lies on him who asserts it.

| | |
|---|---|
| 93 | 547 |
| 98 | 182 |
| 98 | 418 |
| 99 | 675 |
| 93 | 547 |
| 100 | 118 |
| 93 | 547 |
| 106 | 124 |
| 107 | 172 |
| 107 | 549 |
| 93 | 547 |
| 108 | 208 |
| 93 | 547 |
| 109 | 349 |
| 109 | 675 |
| 93 | 547 |
| 116 | 112 |
| 117 | 613 |
| 93 | 547 |
| 118 | 135 |
| 93 | 547 |
| 121 | 145 |
| 93 | 547 |
| 126 | 542 |
| 93 | 547 |
| 130 | 515 |
| 93 | 547 |
| 143 | 364 |
| 93 | 547 |
| 147 | 38 |
| 148 | 495 |
| 93 | 547 |
| d161 | 171 |
| 161 | 444 |
| 93 | 547 |
| 170 | 3 55 |
| 172 | 4 670 |

The State v. Lowe.

4.   ———: PRACTICE: INSTRUCTION.  Where an instruction asked by
a defendant in a criminal case, and to which he is entitled, is not
properly worded, it is the duty of the court to give a correct in-
struction on the point.

5.   ———: MURDER IN SECOND DEGREE: INDICTMENT: MALICE AFORE-
THOUGHT.  An indictment which employs neither the words, "de-
liberately" nor "premeditatedly," but charges the homicidal act
to have been done "feloniously, wilfully, and with malice afore-
thought," sufficiently charges the crime of murder in the second
degree.  The words, "with malice aforethought," are the legal
equivalents of "with malice and premeditation."

6.   ———: PRACTICE: VERDICT.  A defendant cannot be heard to
complain that the evidence shows him to be guilty of a higher
degree of an offence than that of which he was convicted.

*Appeal from Lewis Circuit Court.*—HON. BEN. E.
TURNER, Judge.

REVERSED AND REMANDED.

The court gave the following instructions, asked by
the state :

"1.  The jury are instructed that if they believe,
from the evidence, that the defendant, in Lewis county,
on the thirty-first day of December, A. D., 1881, wilfully,
premeditatedly, and of his malice aforethought, killed
Andy Roan, in the manner and by the means specified
in the indictment, they will find him guilty of murder
in the second degree, and assess his punishment at not
less than ten years in the state penitentiary.  Wilfully,
as here used, means intentionally ; malice aforethought,
as here used, means a wickedness of purpose previously
formed, though it may not be formed but for a moment ;
premeditatedly means thought of beforehand for any
length of time, however short."

"2.  The opinions on questions of insanity which
have been given by the medical experts, are testimony
before you, but are subject to the same rules of credit or
discredit as the testimony of other witnesses, and are not
conclusive on the jury.  The opinions neither establish

The State v. Lowe.

nor tend to establish the truth of the facts upon which they are based; whether the matters testified to by the witnesses in the cause as facts are true or false is to be determined by the jury alone."

"3. The doubt that will authorize an acquittal of the defendant must be a real, substantial, and well-founded doubt, arising from the insufficiency of the testimony, and not a mere possibility that the defendant is innocent."

"4. Before the jury can acquit the defendant on the ground of his insanity they must be satisfied, from the evidence, that, at the time of the shooting of the said Andy Roan, the defendant's mental faculties must have been so perverted and deranged as to render him incapable of distinguishing between right and wrong, and of knowing the right from the wrong of that particular act."

"5. Although the jury may believe, from the evidence in the cause, that, at the time defendant shot Andrew Roan, he was unconscious of the nature of the act, yet if the jury shall further believe, from the evidence in the cause, that such unconsciousness was the immediate result of alcoholic liquors, or liquor voluntarily drank by the defendant, then such unconsciousness affords neither justification, palliation, nor excuse for the shooting by defendant of said Andy Roan; and if you shall believe, from the evidence in the cause, that defendant, under such circumstances, and by the means and in the manner charged in the indictment, shot and killed Andy Roan, then the jury should find the defendant guilty of murder in the second degree and assess his punishment in the penitentiary at not less than ten years."

"6. The law presumes every man is sane, until the contrary is established by the evidence to the satisfaction of the jury, and when insanity in any form is set up as a defence, it is a fact which must be proved like any other fact. The burden of proving such insanity is

upon the defendant, and he is not entitled to the benefit of a mere doubt whether he was or was not insane."

"7. If the jury shall believe, from the evidence in the cause, that, from the year 1862 up to the time of the killing of the deceased, Andrew Roan, the defendant was for certain periods insane, and for certain other periods sane, then before the jury can acquit the defendant they must be satisfied, from the evidence in the cause, that defendant was insane at the time of the killing, and the burden of establishing such insanity rests upon the defendant."

The following instructions were given by the court of its own motion:

"1. If the jury acquit the defendant on the sole ground that he (the defendant) was insane at the time of the commission of the offence charged in the indictment the fact shall be so found in their verdict, and the jury are instructed further, that, in the event they find that the defendant was insane at the time of the commission of the offence, they will further find whether or not the defendant has or has not entirely and permanently recovered from such insanity."

"2. If the jury acquit the defendant on the sole ground that he was insane at the time of the commission of the offence charged, and they further find that he has entirely and permanently recovered, their verdict may be in the following form: We the jury find the defendant not guilty on the sole ground that he was insane at the time of the commission of the alleged offence, and that he has entirely and permanently recovered."

"3. If the jury acquit the defendant on the sole ground that he was insane at the time of the commission of the alleged offence, and find that he has not wholly and permanently recovered, their verdict may be in the following form: We the jury find the defendant not guilty on the sole ground that he was insane at the time of the commission of the alleged offence, and we further

find that he has not wholly and permanently recovered."

The following instructions were given by the court at defendant's request:

"1. The law presumes the defendant innocent of the crime charged against him until he is proven guilty."

"2. The fact that an indictment was found by the grand jury against defendant, or the indictment itself, cannot be considered by the jury in making their verdict."

"3. The fact that the defendant did not testify in the case cannot be used to his prejudice, nor be considered by the jury in making their verdict."

"4. If the jury shall believe, from the evidence in the cause, that, at the time defendant shot the negro, he was insane or of unsound mind, and that he was not conscious of what he was doing when he fired his pistol at the negro; that he did not know the nature of the act he was about to commit when he fired the pistol; that he did not know the act was criminal; that he did not know that, by doing the act, he was subjecting himself to punishment; that he did not know right from wrong; that he did not possess capacity at the time sufficient to form a criminal intent and purpose; or that he was impelled by some insane impulse, and that either his reason or mental powers were so deficient that he could not restrain from doing the act with which he is charged, then they should find defendant not guilty."

"5. If the jury shall believe, from the evidence, that defendant was only partially insane at the time he shot the negro, and shall further believe that, at the time he did the act, his mind was in such a condition that he was not capable of distinguishing between right and wrong in regard to the act with which he is charged, or was unconscious at the time he committed the act of

his true condition, or the nature of the act charged against him, they should find the defendant not guilty."

"6.   If the jury shall believe, from the evidence, that, at the time defendant shot the negro, his mind was diseased or unsound, then it is immaterial as to whether the diseased or unsound condition of his mind was the result of the excessive use of whiskey or other intoxicants; or of disease, injury, or other cause; and though the jury should believe that such diseased or unsound condition of mind was the result of drunkenness, or the excessive use of intoxicants, such diseased or unsound condition of mind is entitled to the same consideration as a diseased or unsound condition of mind arising from any other cause."

"7.   If the jury believe, from the evidence, that, at the time defendant shot the deceased, his mind had been so far impaired or destroyed that he was unconscious, at the time of committing the act, that it was wrong, and that he ought not to do it; or that he was irresistibly impelled to the commission of the act by an insane impulse, and had not the ability to resist that impulse, nor to control his actions, and choose between right and wrong, you will find him not guilty."

"8.   If the jury believe, from the evidence, that, at the alleged killing, the defendant was so far insane as not to be able to distinguish between right and wrong with respect to the act in question, or if they should find, from the evidence, that he was urged to the commission of the act by an insane impulse so powerful as to overcome his will and judgment, or so powerful that he was unable to restrain it, even though he might know and feel that the act he was committing was wrong and a violation of law, then, in contemplation of law, he would be insane and you should acquit him."

"9.   The court instructs the jury that if they believe, from the evidence, that, at the time of the killing,

the mental and moral faculties of the defendant were so perverted from their normal condition by the habitual use of intoxicating liquors as to prevent him from understanding the nature and consequences of the act, then it will be the duty of the jury to find the defendant not guilty."

"10. Although the jury may believe, from the evidence in the cause, that defendant was drunk at the time he shot the deceased, still the jury will find the defendant not guilty if they believe, from the evidence, that at the time the defendant was insane."

"11. Although the jury may believe, from the evidence, that defendant killed deceased while drunk, still the jury will find the defendant not guilty, unless they further believe, from the evidence, that such killing was the immediate result of a fit of intoxication, and not of insanity."

"12. The term insanity, as used in the instructions, means such a perverted and deranged condition of the mental and moral faculties as renders a person incapable of distinguishing between right and wrong, and makes him unconscious at the time of the nature of the act he is about to commit. Such insanity, if proven to the reasonable satisfaction of the jury to have existed at the time of the commission of the act, is in law an excuse for it."

"13. Before the jury can find defendant guilty they must believe that he shot the negro with premeditation and malice aforethought. Now if they shall believe that, at the time he shot the negro, he was insane, or of unsound mind, and was at the time he fired the pistol unconscious of what he was doing, or did not then know or understand the nature of the act he was committing, or about to commit, or did not know that it was criminal and that he would be punished therefor, then and in that case the act was done by defendant without

premeditation or malice aforethought, and the jury should find defendant not guilty."

"14. The evidence of the experts who testified in this cause is to be taken and considered by the jury like the evidence of the other witnesses who testified in the cause."

"15. When the defence is insanity it is not necessary that the insanity of the defendant be established beyond a reasonable doubt; it is sufficient if the jury is reasonably satisfied by the weight or preponderance of the evidence that the defendant was insane at the time of the commission of the act."

"16. The law presumes the defendant to be sane at the time of the commission of the offence and the duty of removing this presumption rests upon the defendant. The law also presumes the defendant to be innocent until he is proven to be guilty and the duty of proving his guilt rests upon the state. After considering these presumptions, as well as the whole evidence in the cause, if the jury entertain a reasonable doubt as to the guilt of the defendant, it will be the duty of the jury to find the defendant not guilty."

The court refused the following instructions asked by defendant:

"17. Although the jury may believe, from the evidence in the cause, that the defendant was, at the time he shot the negro, drunk, or under the influence of intoxicating liquors; yet if they shall also believe that, at the time he shot the negro, he was insane or of unsound mind, then and in that case, before they can find defendant guilty they must believe, from the evidence, that his drunkenness or intoxication was the immediate cause of him shooting the negro, and that his insanity, or unsoundness of mind was not remotely the cause thereof; and if they shall believe that defendant, at the time he shot the negro, was insane or of unsound mind, then it is immaterial whether that insanity or unsoundness of

mind was caused by the excessive use of intoxicating liquors or from other cause."

"18.  If the jury shall believe, from the evidence, that defendant was insane when he left the state of Kentucky, in the year A. D. 1877, then the presumption of the law that he was sane and of sound mind at the time he shot the negro is removed and repelled ; and in case they shall believe that he was insane or of unsound mind when he left Kentucky, in 1877, as aforesaid, then and in that case the law presumes that such insanity continued up to and existed at the very time he shot the negro, and in that case the defendant is not required to prove that he was insane or of unsound mind at the time he shot the negro.  But it devolves upon the state, in that case, to prove that, at the time defendant shot the negro, he was sane, or knew the right from the wrong."

"19.  If the jury shall believe that defendant was insane in Kentucky, or in Missouri, with lucid or partially lucid intervals or periods in which he knew right from wrong, then and in that case it devolves upon the state to prove, by the evidence in the cause, that defendant shot the negro when he was in one of his lucid or partially lucid intervals or periods."

"20.  If the jury shall believe, from the evidence in the cause, that defendant was insane, in 1877, when he left Kentucky, or at any time in Kentucky before 1877, then, as before stated, the law presumes that he was insane or of unsound mind at the time he shot the negro. And although the jury may believe that the defendant, at the time he shot the negro, was drunk or under the influence of intoxicating liquors, that fact—that is, the fact that he was drunk or under the influence of intoxicating liquors—does not remove the presumption of the law that he was insane or of unsound mind at the time he fired the fatal shot ; and though the jury should believe him to have been drunk or under the influence of intoxicating liquors at the time he shot the negro ;

The State v. Lowe.

still the burden is upon the state to prove defendant was sane or of sound mind, or knew right from wrong when he shot the negro, and that his drunkenness or intoxication was the immediate cause of the fatal shot."

*Blair & Marchand* for appellant.

(1) The court erred in giving instructions numbered four, five, six, and seven for the state. Whar. Crim. Law [3 Ed.] p. 83; 1 Whar. Crim. Pleading and Prac., secs. 22, 24, 30, 31; 1 Bishop's Crim. Law, secs. 378, 386, 387, 388, 406, 407; Kelley's Crim. Law, sec. 36, p. 21; 2 Greenl. on Evid., secs. 372, 373, and notes, 371, 371*a*, 374; *State v. Baldwin*, 12 Mo. 223; *State v. Erb*, 74 Mo. 199; *Sawyer v. State*, 35 Ind. 80; *People v. Cummings*, 47 Mich. 695; *Looney v. State*, 10 Tex. App. 520; *Commonwealth v. Mosler*, 4 Barr (Pa.) 267; *State v. Robinson*, 20 W. Va. 713; *Coyle v. Commonwealth*, 100 Pa. St. 573; 1 Whar. & S. Med. Jur. [3 Ed.] secs. 152, 162; *Freeman v. People*, 4 Denio, 10; *State v. Hurley*, 1 Houst. Cr. C. (Del.) 28. Instruction number five ignores the question of insanity entirely, and erroneously tells the jury to convict of murder in the second degree. The evidence did not warrant it. *State v. Erb*, 74 Mo. 199; *State v. Schoenwald*, 31 Mo. 153; *State v. Starr*, 38 Mo. 269; *State v. Alexander*, 66 Mo. 148; *State v. Mahley*, 68 Mo. 315; *State v. Wieners*, 4 Mo. App. 492. There was no evidence upon which to base instruction numbered seven. (2) The court erred in refusing to give instructions numbered seventeen, eighteen, nineteen, and twenty, asked by defendant. Instruction numbered seventeen should have been given. The act was the result of dipsomania, melancholia, or delirium tremens, and was excusable. Whar. Cr. L. [3 Ed.] sec. 37, and p. 92, note 2; 2 Greenl. Evid., sec. 374; *United States v. Drew*, 5 Mason, 28; 1 Russell on Crimes [3 Ed.] 78; *State v. Hundley*, 46 Mo. 414; *State*

*v. Erb*, 74 Mo. 199; Kelley's Cr. Law, secs. 27, 28, 41; Whar. & Stille Med. Jur., secs. 202, 204; *People v. Cummings*, 47 Mich. 334. Instruction numbered eighteen should have been given; it asserted correct principles. 1 Greenl. Evid., sec. 42; 2 *Ib.*, sec. 371, and note 5; Kelley's Cr. Law, sec. 40; 1 Whar. & S. Med. Jur. [3 Ed.] secs. 61, 162, 747; 2 Whart. on Evid. (1877) sec. 1253, note 5; 2 Bish. Cr. Proc. [3 Ed.] sec. 674; 2 Best. on Evid. [1 Am. Ed.] sec. 405; *Saxon v. Whitaker*, 30 Ala. 237; *Titlow v. Titlow*, 54 Pa. St. 216; *Ripley v. Babcock*, 13 Wis. 425; 2 Starkie on Evid. [6 Ed.] 933. (3) The instructions given are, as a whole, contradictory and misleading. (4) The court failed to declare all the law applicable to the case. (5) The verdict is contrary to the evidence in the case and not supported by it.

*B. G. Boone*, Attorney General, for the state.

(1) The word, "premeditatedly," is not used, but it is included in the term, "malice aforethought," which means with malice and premeditation. When the term, "malice aforethought," is used in an indictment with the word, "murder," as in the case at bar, it distinguishes the felonious killing called murder from what is called manslaughter. The act is charged to have been done "feloniously, wilfully, and with malice aforethought." *State v. Wieners*, 66 Mo. 13; *State v. Curtis*, 70 Mo. 594; *State v. Robinson*, 73 Mo. 306; 1 Bish. Cr. L. [5 Ed.] sec. 429; Bouv. Law Dic., "malice aforethought." (2) Insanity, to constitute a valid defence to a criminal charge, is such only as renders a defendant incapable of knowing the right from the wrong of the particular act which is the subject of the charge. *State v. Baldwin*, 12 Mo. 223; *State v. Huling*, 21 Mo. 464; *State v. Erb*, 74 Mo. 199; *State v. Kotovsky*, 74 Mo. 247. The fourth instruction given by the court, at the instance of the state, enunciated the doctrine above set

forth and was correct. (3) Drunkenness, even to insen-·
sibility, or temporary insanity produced by intoxication,
is no excuse, nor does it extenuate crime when a defend-
ant made himself drunk. *State v. Sneed*, 91 Mo. 552;
*State v. Ramsey*, 82 Mo. 133; *State v. Edwards*, 71 Mo.
312; *State v. Dearing*, 65 Mo. 530; *State v. Hundley*,
46 Mo. 416; *State v. Cross*, 27 Mo. 332; *State v. Harlow*,
21 Mo. 446. The fifth instruction, given at the instance
of the state, declares the law as above stated. The rul-
ing in England, and in courts of last resort in this
country, cited below, is, that voluntary intoxication
furnishes no excuse for crime committed under its influ-
ence, and that this rule applies even when the intoxica-
tion is so extreme as to make the person unconscious of
what he is doing. *Beverly's Case*, 2 Coke's Reports,
573; *Rex v. Ayes*, Br. Cr. C., Russ. & Ry., 166; 1 Bish.
Cr. L. [5 Ed.] secs. 400, 401; *Commonwealth v. Hart*,
·2 Brew. (Penn.) 546; *McIntyre v. People*, 38 Ill. 514;
*People v. Garbutt*, 17 Mich. 9; *Henslie v. State*, 3
Heisk. (Tenn.) 202; *Pirtle v. State*, 7 Humph. (Tenn.)
·644, and cases cited and discussed. (4) The law pre-
sumes that a party indicted for a crime is sane, and the
burden of proof is upon the defendant to show that he
was insane at the time of the commission of the offence
charged. *State v. Redemcier*, 71 Mo. 176, and cases
cited; *State v. Baber*, 74 Mo. 294. The sixth and
seventh instructions, given by the court at the instance
of the state, declare the law as above stated, and are
not objectionable. Under the evidence the court properly
instructed the jury that they might find defendant guilty
of murder in the second degree. Instruction number
seven was supported by the evidence and was properly
given. (5) Appellant complains of the action of the
trial court in refusing to give instructions numbered
seventeen, eighteen and nineteen. The seventeenth, in
regard to the insanity of defendant caused by intoxica-
tion, is misleading, and does not correctly declare the

The State v. Lowe.

law. *Vide* cases cited under paragraph 3, of this brief. The eighteenth was properly refused, because proof of insanity of the accused at some previous period of his life does not raise the presumption that he was insane at the time of the commission of the act charged. The evidence to support the plea of insanity must show that the accused was laboring under such a defect of reason at the time of the commission of the offence as not to know that he was doing wrong. The burden of proving the insanity of the accused does not devolve upon the state. Although there is proof of insensibility on the part of the accused, it will not throw the burden on the state to show that he was sane. *State v. Redemeier, supra*, and cases cited. The nineteenth is a modification of the eighteenth, and for like reasons was properly refused. The twentieth is to the same effect, and was also properly refused.

SHERWOOD, J.—The counsel for the defendant, who tried this cause in the circuit court, and are, therefore, presumed to be somewhat conversant with the facts therein, have not seen fit to furnish us with a statement of those facts. I will, therefore, have to wade through this voluminous record in order to become acquainted with them.

The homicide, which caused this appeal, occurred December 31, 1881, in the town of La Belle, Clark county, Missouri. On that day, about dark, Stoddard, the landlord of the hotel, on going into the office, saw sitting there by the stove the defendant in his socks. Several others were present, among them the deceased, a negro named Andy Roan, who was engaged in carrying water, when one Yates came in and asked Roan to pay a small debt he owed him; this was spoken in pleasantry, and was repeated, whereupon the defendant rose to his feet, and with the exclamation, "I will make him pay it," drew his pistol and shot Roan in the

abdomen, from which wound he died within a few days. The landlord, after a struggle, took Lowe's pistol from him; he then tried to make his escape from the room, but the landlord threatened to shoot him, and on the second threat he returned and seated himself in the chair from which he had arisen. The sheriff of the county then went into the office, when the landlord handed the pistol to him, and he asked the defendant why he had shot Roan, and he replied, "That is my business." Asked also, by the sheriff, why he carried the pistol, he replied in the same language.

Just before the shooting, the defendant had asked to be shown to his room, and when the landlord went to see about the room for him, and returning told him he was ready to show him to his room, he replied that he did not believe he would go. Very soon thereafter the shooting occurred. It seems the defendant was a stranger to the landlord, and he certainly was to Yates, who had never seen him before that afternoon. Yates, story of the affair, in brief, is, that a little while before the shooting the defendant, who had his overcoat on and in his sock feet, and appeared to be drinking, hunched him with his elbow and said, "I am drunk—pretty d—d drunk, don't give me away;" that he then handed a bottle of whiskey to Yates and Hinson and asked them to take a drink with him, but they refused, when the defendant said, "That leaves that much more for me." Yates also stated that the defendant, after telling the sheriff, "that's my business," immediately thereafter said, "I submit, gentlemen; let me get my boots on." Yates also said that the defendant looked like and hiccoughed like a drunken man, and his tongue seemed to be thick. Wilson was also present when the shooting occurred. Wilson had seen the defendant about a year before, when he and his nephew hired a horse and buggy from Wilson, who kept a livery-stable. Wilson states that when the defendant shot Roan, he

then made toward the door, after the pistol was taken from him, when Stoddard told him to stop or he would shoot him, and Wilson then took hold of the defendant and told him to stop or Stoddard would shoot him, and that thereupon the defendant sat down in a chair and said nothing.

Prior to the time of going to the hotel the defendant had been at Wilson's livery-stable about 2 o'clock, when he made inquiry about feeding his horse and about a hotel; that he looked like a man who was cold, not drunk, but this was some three hours before the fatal occurrence. Medical testimony was introduced showing that the death of Roan was caused by the pistol shot.

Sommers, the sheriff, who arrested the defendant, had also seen him a couple of hours prior to the shooting in the room in which it took place. Lowe spoke to him and called him "Doctor," and asked him what was the matter with him (Lowe), and asked him to feel his pulse; that Lowe had a bottle of whiskey, drank from it and asked him to drink; wanted Sommers to tell him what was good for him; Sommers thought he was drunk, felt of his pulse and told him to take some coal oil.

Nunn corroborates the testimony of Sommers in most particulars. In addition he says that Lowe told Sommers he was drunk, and the latter, replied, "I think you are," and prescribed coal oil; that Lowe had taken a drink from his bottle; he came back, took a seat and said he was "sanctified;" that Lowe, after saying he was drunk, repeated the remark with the qualification, that he was "pretty d—d drunk;" said he was raised in Kentucky; was raising a crop at Williamstown; said he would not tell where he got his whiskey; that he was able to take care of himself; had bought his whiskey and paid for it; could take care of himself; but did not want to be given away, and was down on his way below

La Belle. This witness says also that Lowe appeared to be somewhat under the influence of liquor; not exactly steady on his feet; his articulation not very good; seemed like a man who had been riding in the cold and stunned. His son, also a witness on behalf of the state, testified to seeing Lowe drink, and that he appeared to be drunk. This witness confirms the statement of Yates that Lowe, when they refused to drink with him, said: "There will be that much more left for me."

The state here rested, and evidence was introduced for the defence. It consisted, in part, of numerous depositions taken in Kentucky. I will give the substance of four of these depositions and let them stand as types of the others. The deposition of McSpeak, taken in July, 1882, in Boone county, Kentucky, was to the effect that he became acquainted with the defendant in 1864, in Grant county, Kentucky, where Lowe and witness lived; that his full name was William Morehead Lowe; some called him "Moses" Lowe; knew him personally and intimately; had worked for him in Kentucky some five or six years, till Lowe moved to Missouri; that, in June or July of said year, while the witness lived with Lowe and slept in the same room with him, Lowe left home directly after dinner, and returned in the evening just before supper, ate supper, when witness and others present tried to induce Lowe to go bed, but he refused, stating that he was afraid; dare not sleep in the room, but went down into the orchard, and that was the last seen of him until morning, when witness, on getting up, saw Lowe coming up from the orchard, and asked him where he stayed the previous night, when he replied: "I dozed there, and they did not get me." Witness then asked him "who," and he said, "them fellows," and that was all the reply he would make; that after breakfast Lowe would work a few minutes, and then dodge off at something else; did not work at regular work, as he usually did; that he looked wild out of his

eyes the evening he came home, seemed excited and scared all the time, and remained in that condition some four or five days. Witness further stated that, in June, in the year 1866, he was at work in his own cornfield close to where Lowe lived, when the latter called him by name to come to him, the sound of the voice indicating he was in some brush; that witness called to him to come to witness, but Lowe replied, "I can't, you must come to me." Witness then started in the direction from which the voice proceeded and found Lowe crouched down behind a stump in some brush, looking wild out of his eyes, and afraid of something or somebody. Witness then spoke to him, and asked him what he was doing there, when he replied, "them fellows are after me;" and when witness asked him what fellows, Lowe said, "them fellows; they were after me all night, and they are still after me to-day," and witness could not persuade Lowe to the contrary. Witness further stated that on 'that occasion Lowe insisted on witness going with him to "Dry Ridge," saying that if witness would go "them fellows would not hurt him."

Witness thereupon went with him to Dry Ridge, stayed with him all day, and returned with him to witness' house, where he stayed all night; in the morning seemed better, but still looked wild out of his eyes when he went home; that, on these occasions, though he was in the habit of taking his dram like other citizens, yet that he was not, in the opinion of witness, drunk or under the influence of whiskey, nor did witness see him drink any liquor during these times, and that witness would have known it had he done so. Witness further stated that, in 1866 or 1867, Lowe and witness still living in Grant county and in the same neighborhood, and about one and one-half miles apart, Lowe disappeared from home for about three weeks, none of the neighbors knowing what had become of him. Witness then went to Covington, Kentucky, and stopped at the

Drovers' hotel. Lowe called on him there, having seen him in the barroom, and looked more wild and excited out of his eyes than on the former occasions; asked witness to take a walk with him, and on going out on the pavement, urged witness to go to McLaughlin's with him and get supper. Witness urged him to stay and eat supper with him at the hotel, but Lowe said: "I can't stay here," and being asked why, replied: "They were after me all night, and they are still after me." Witness then asked him "who," and the only reply he could get out of him was "them fellows," and told witness that if he would go down with him to McLaughlin's that "them fellows would not bother him; that they were afraid of witness." Witness went with him and took supper at McLaughlin's and they went to bed, but Lowe slept none that night; had three pistols on a stand near his bed, and was up and down every ten minutes through the night; when he would jump up he would pick up a pistol and present it at the window as though he were going to shoot some one, and when witness would tell him to come back to bed, that nobody would hurt him, he would come, only to repeat the same movement again and again through the night, and during the night he would frequently break out into a long, dry, and unnatural laugh, and when asked what he was laughing about, would make no answer.

The next morning Lowe looked as wild and excited as he did the night before, but went with witness to Cincinnati; walked around all day; stayed with witness that night at the Drovers' hotel; the next morning seemed better and returned with witness to his home in Grant county; that on this last occasion Lowe was not drinking, nor under the influence of liquor; that during these three "spells," and the most of the time, Lowe was melancholy, moody, and despondent, and when standing would repeatedly drop his head as though in a deep study and trouble, and while standing or sitting

The State v. Lowe.

would often break out into an unnatural laugh, as before stated, and when asked the cause would either say, "Oh, nothing," or else would make no answer, and that Lowe's conduct was about the same from the time witness first became acquainted with him until he went to Missouri, and that witness noticed Lowe's conduct all the more closely because of having been informed by the neighbors that, in 1863, the year before the witness moved to the neighborhood, Lowe had run off into the woods and remained some time, giving as a reason for his absence that he was afraid to stay at home. Witness concluded by stating that in his opinion, that from the time witness first became acquainted with him up to the time he moved to Missouri Lowe was of unsound mind.

The depositions of Beard, J. G. Green, and D. Green, Dry Ridge, Grant county, Kentucky, taken in July, 1882, were next read in evidence. Beard's deposition was to the effect that he worked with Lowe pretty much all the time during the years 1870, '71, and '72 ; worked with him some six or eight months before discovering something wrong in his conduct ; while at work he would suddenly become wild and would not appear to know what he was doing ; sometimes the spells would come on suddenly and sometimes gradually ; would commence talking on one subject, become excited and change to another subject, without finishing the first conversation. While in one of those "spells" Lowe would say some persons wanted to kill him, or were watching for him, and would fire his pistol or gun into the trees or up into the air; sometimes, while in one of those "spells," would leave the place and be gone several days ; during those "spells" would frequently say, "them fellows are after me ;" sometimes in those "spells" would leave the house after night, take his gun and fire it off after leaving the house. At other times, when Lowe would say some persons were after him trying to kill him, he would get down on his

hands and knees and crawl into the weeds, and some-
times crawl along the fence, as if he were trying to hide
from somebody; would become dissatisfied with his best
friends and tell them they were trying to betray him.
Other instances were given by this witness tending to
prove insanity, and the opinion of the witness was that
Lowe was of unsound mind.

The deposition of W. J. Green was much to the
same effect as that of the preceding witnesses. He gives
an instance that when he and his wife were riding by a
house where Lowe was, when Lowe ran out into the
front yard, and when about twenty steps distant he
began firing his pistol towards them, causing witness'
wife's horse to throw her, but never stopped for that, but
kept on firing until he got through, when he gave a dry
laugh and hastily walked back to the house. In his de-
position, D. Green confirms the testimony of the other
witnesses and testifies to Lowe having, without any ap-
parent cause, shot at Nix, a blacksmith, while Nix was
conversing with others, and Lowe was sitting down on
a bench apart from the rest and saying nothing. This
witness also testifies to seeing Lowe hiding around in
the bushes, and saying "they are after me;" that this
occurrence took place in 1862, but after the death of
his two nephews in 1866, to whom Lowe seemed much
attached, he seemed to take their deaths very hard, and
his mind seemed to grow worse, and his bad spells be-
came more frequent and more noticeable. In the spring
of 1870 this witness discovered Lowe hiding around in
his cornfield, and when discovered Lowe ran off into the
woods and brush, but after two or three hours returned,
appearing wild and excited, but upon being asked what
was the matter, made no reply. This witness states that
from that time on Lowe was frequently in this same
condition of mind until he left for Missouri, the
"spells" averaging once a month. In the opinion of
this witness, the mind of Lowe was unsound.

All of the witnesses bore testimony to Lowe's good reputation for being peaceable and orderly, and the other depositions are of the same general tenor and effect as those already set forth. Witnesses were also introduced, the general purport of whose testimony was the same as that already gathered from the depositions. Dr. Vincent, one of these witnesses, became acquainted with Lowe in the spring of 1881; testified to the peculiarities of Lowe's conversation; how he would flit from one subject to another wholly foreign to it; would engage in a conversation with the witness, suddenly stop, nudge witness and take him off to one side, tell him something; then would say to him, "you know all about that," and when witness would say "what?" Lowe would reply, "never mind, I will tell you some other time," and that Lowe had a number of such interviews with him, about once a month, or oftener. On one occasion this witness relates, that when Lowe was at the postoffice in Steffensville, two boys got into a scuffle, when Lowe pulled out his pistol and said, "I can settle that d—d quick," and when witness told him to put up his pistol he did so, remarking, "just as you say." This witness says that on another occasion he met Lowe in the road driving two horses; had hay on the wagon; he stopped, showed witness a shotgun hid under the hay, and said: "I will fix them fellows this time," and would point to his dog and say something about "them fellows." These remarks Lowe repeated several times. This witness also spoke of Lowe using liquor frequently, but not in sufficient quantities to produce the results already stated; and that Lowe seemed to have "emotional insanity" with "melancholia." He also testified that, in his opinion, Lowe, when he met him in the road on the occasion referred to, was not conscious of what he was doing. He further said that, in his opinion, Lowe was in an unsound condition of mind on the Friday next preceding the Saturday of the homicide.

Nicols testified that Lowe was thrown from his mare in Grant county, Kentucky, about 1861 or '62, and badly hurt about the head and neck, confined to the bed for about a month, and for a long time thereafter could not straighten his neck or turn his head; that witness first noticed his peculiarities of conduct in 1862, after he received that hurt. Those peculiarities this witness relates in much the same way that the other witnesses do; that he would get off to himself, sit down as though in a deep study, head leaning forwards, then spring up and walk off rapidly and break out into a laugh; at other times, and frequently, would say to witness, "them fellows are after me," and would ask witness if he "did not see them fellows after him." This witness states that, at one of these times, when Lowe lived with him on his home farm in Kentucky, in the fall of 1862, Lowe went out into the yard one night, and calling witness out there, told him: "I told you them fellows were after me; don't you see them up yonder above the barn?" that witness made light of him and proposed to him to go up there and convince him that there was nobody there; they accordingly went, but found nobody, and Lowe then said to witness: "I reckon you are right, George; I must be crazy." Frequent instances of this sort were related by this witness, who also stated that though Lowe used whiskey, he never did it to excess to witness' knowledge, and that save when in those spells, he attended to his business. In the opinion of witness, Lowe, when in one of these "spells," was not in his right mind. According to this witness, those peculiarities of conduct, and fears of persons being after him to kill him, extended down to the fall of 1881, and that he complained of his head down to that time. This witness was also of the opinion that Lowe was not of sound mind at the time of the homicide.

There was much other testimony of this sort introduced. There was some testimony offered by the state

in rebuttal, but from many considerations it did not equal in force or directness that offered on behalf of the defendant, the witnesses for the state not possessing equal opportunities with those who testified in his behalf. There was testimony offered on behalf of the state, also, to the effect that Lowe was a man of dissipated habits, and the testimony of most of the medical experts was to the effect that Lowe's mental condition was owing to those habits, superinduced, perhaps, to some extent, by the hurt he received when thrown from his mare in Kentucky. With one exception, however, all the experts pronounced Lowe insane at the time he fired the shot, and incapable of distinguishing right from wrong in that particular act. One of the physicians thought Lowe was sane, but drunk at the time of the homicide. Another physician thought the mental condition of the defendant was the result, not of dipsomania, or alcoholism, but of the hurt he had received.

I. I have set out the evidence at so great a length for two purposes: (1) Because it is claimed that the verdict is so palpably wrong and against the evidence as to indicate that the jury were actuated by prejudice; and (2) in order to a better understanding of the instructions given and refused. I do not regard the evidence tending to show the defendant's guilt, of such a character, and as lacking so much in probative force, when considered in connection with that offered on the part of the defendant, as would authorize this court in interfering with the verdict of the jury, and in saying this I do but follow frequent adjudications of this court. *State v. Cook*, 58 Mo. 548; *State v. Musick*, 71 Mo. 401. Here the point sharply made and contested was, whether the homicidal act was the result of a disordered brain by reason of drunkenness or by reason of insanity, and the verdict of the jury has sanctioned the latter conclusion, a conclusion which should not be disturbed if proper instructions were given.

II. I am thus brought to consider the instructions given and refused. They will accompany the report of this case. Of those instructions which were given for the state, speaking of them in a general way, they are unobjectionable, announcing as they do the well-settled law of this court. Some of those given on behalf of the defendant are, perhaps, too favorable to him, but there is no call to discuss them, as he cannot complain. The fifth instruction, given at the instance of the state, contains no error, for the reason that there was evidence tending to show that the defendant's condition was the immediate result of drunkenness, and such a condition, as a matter of course, could afford no extenuation of a crime committed whilst under such influence. But I have been in doubt as to the propriety of the refusal to give the eighteenth instruction asked by the defendant. It was as follows:

"18. If the jury shall believe, from the evidence, that defendant was insane when he left the state of Kentucky in the year A. D., 1877, then the presumption of the law, that he was sane and of sound mind at the time he shot the negro, is removed and repelled, and in case they shall believe that he was insane or of unsound mind when he left Kentucky in 1877, as aforesaid, then and in that case the law presumes that such insanity continued up to and existed at the very time he shot the negro, and in that case the defendant is not required to prove that he was insane or of unsound mind at the time he shot the negro. But it devolves upon the state, in that case, to prove that, at the time defendant shot the negro, he was sane or knew the right from the wrong."

The rule of law, as I understand it to be, is, that, where insanity is the result of some temporary cause, as a fit of sickness or the like, that then no presumptions of continuity flow from such temporary cause; but, on the other hand, when you establish, as the evidence tended

The State v. Lowe.

to do in this case, an insane condition of mind, existing and exhibiting its peculiarities for a long period of years, I incline to think that an instruction embodying the principle evidently intended to be contained in the one asked should have been given. 1 Greenl. Evid., sec. 42; 2 Bishop Crim. Proc., sec. 674; 2 Greenl. Evid., sec. 689; 1 Whart. Crim. Law, sec. 63; *People v. Francis*, 38 Cal. 183; 1 Whart. & Stille Med. Jur., sec. 61; *Crouse v. Holman*, 19 Ind. 30; *Armstrong v. Timmons*, 3 Harr. (Del.) 342. If the instruction was not properly worded, it was the duty of the court, under our practice, to give a correct instruction on the point. This habitual, permanent, or chronic state of insanity being shown to exist, its continued existence will be presumed, and the burden of establishing a subsequent lucid interval at the time of the act, either civil or criminal, being done, lies on him who asserts it. Chamberlayne's Best's Evid., sec. 405; *Menkins v. Lightner*, 18 Ill. 282; Whart. Crim. Evid., sec. 730, and cases above cited; *Att'y Gen'l v. Parnther*, 3 Bro. C. C., s. p. 441. Indeed the bare assertion that a man has lucid intervals is tantamount to the assertion that he is not cured of his lunacy, but has intervals of reason. *Saxon v. Whitaker*, 30 Ala. 237; *Ripley v. Babcock*, 13 Wis. 425. In *State v. Wilner*, 40 Wis. 304, where the circumstances tending to show insanity or delusion were not nearly so strong as in the case at bar, it was held error to refuse an instruction similar to the one under discussion.

For the reasons stated, error was committed in giving the seventh instruction on behalf of the state, which was as follows:

"7. If the jury shall believe, from the evidence in the cause, that from the year 1862, up to the time of the killing of the deceased, Andrew Roan, the defendant was for certain periods insane, and for certain other periods sane, then before the jury can acquit the defendant they must be satisfied, from the evidence in the

cause, that defendant was insane at the time of the kill-
ing, and the burden of establishing such insanity rests
upon the defendant."

III.   I now proceed to examine the indictment, the
insufficiency of which has been questioned :   It employs
neither the words, "deliberately," nor "premeditat-
edly," but charges the homicidal act to have been done
"feloniously, wilfully, and with malice aforethought."
The point is whether the indictment sufficiently charges
the offence of which the defendant stands convicted ;
i. e., murder in the second degree.   Our statute provides
that, "Every murder which shall be committed by
means of poison, or by lying in wait, or by any other
kind of wilful, deliberate, and premeditated killing, or
which shall be committed in the perpetration, or attempt
to perpetrate, any arson, rape, robbery, burglary, or
mayhem, shall be deemed murder in the first degree."
R. S., 1879, sec. 1232.

The next succeeding section says :   "All other kinds
of murder at common law, not herein declared to be
manslaughter, or justifiable or excusable homicide, shall
be deemed murder in the second degree."   R. S., sec.
1233.   This is a well-bethumbed statute, and a great
deal has been written concerning it.   Prior to 1531,
when the statute of 23 Hen. VIII., c. 1, section 3, was
passed, only one form of felonious homicide was known ;
that was known as manslaughter, and that form neces-
sarily included those malicious killings since denom-
inated murder.   All homicides were then punishable
with death ; but clergy was allowed for all.   But that
statute, according to its express terms, took away clergy
in all cases where the homicide was committed "wilfully
and of malice aforethought," and to that class of
offences thus particularly designated, the name of mur-
der was subsequently given.   This statute sharply de-
fined the distinction, which still remains, between mur-

der and manslaughter, as well in England as in this country.

After that statute went into operation, in order to set forth every allegation of the fact pertaining to the punishment, and thus comply with a well-known rule of criminal pleading, the old form of indictment was expanded so as to include the words, "wilfully and of malice aforethought." Indictments thus expanded contained the operative words of the statute referred to, thus : "That A, at, etc., on, etc., in and upon B, feloniously, wilfully, and with malice aforethought, did make an assault," etc., etc. Our statute, above quoted, having divided murder into two degrees, designating murder in the first degree as a deliberate and premeditated killing, and providing that "all other kinds of murder at common law not herein, etc., * * * shall be deemed murder in the second degree," it became necessary under the rules of good pleading, in order to charge murder in the first degree, to expand the old common-law form of indictment for murder, by adding the operative words of our statute to the old common-law form, and leaving murder in the second degree to be described under the old form, just as manslaughter continued to be described under the old form after the change in form necessitated by the enactment of 23 Hen. VIII. Murder in the second degree is murder at common law, bereft of all the aggravating incidents designated in section 1232. In a word, murder in the first degree, under our statute, is, in one sense, the *subtrahend* of murder at common law, and murder in the second degree, the *remainder.* Since murder in the second degree is murder at common law, its only appropriate description is to be found in the old common-law form of indictment for murder after the change made by 23 Hen. VIII. These views will be found fully supported. 2 Bishop Crim. Proc., secs. 498, 499, 541, 563, and 564 ; *Bower v. State,* 5 Mo. 364 ; *State v. Jones,* 20 Mo. 58 ; *Fouts v. State,* 4 G. Greene (Iowa)

500; *State v. McCormick*, 27 Iowa, 402; and cas. cit.; *State v. Brown*, 21 Kan. 38.

The words, "with malice aforethought," are the legal equivalents of "with malice and premeditation." *State v. Curtis*, 70 Mo. 594; *People v. Vance*, 21 Cal. 400.

IV.    It is claimed that a reversal of the judgment must occur because the evidence shows a case of murder in the first degree, or of manslaughter in the fourth degree.    Under the provisions of section 1654, Revised Statutes, 1879, it constitutes no ground of objection that a person is found guilty of an offence less in degree than that of which he is really guilty.    It seems singular, however, that the indictment was not drawn for murder in the first degree.    The defendant, if not insane, was clearly guilty of that degree of crime.

For the errors mentioned, the judgment should be reversed and the cause remanded.    All concur.