## THE STATE v. BERKLEY, *Appellant.*

### DIVISION TWO.

1.  **Criminal Practice:** INDICTMENT: INDORSEMENT OF NAMES OF WIT-
    NESSES.   It is proper in a criminal case for the court to permit the state
    at the trial to indorse names of witnesses on the indictment, and it is
    immaterial that such indorsement is made by the successor in office of
    the prosecuting attorney who wrote the indictment.

2.  ———: INSTRUCTION: HARMLESS ERROR.   An instruction which is too
    favorable to the defendant cannot afford a ground for reversal of the
    judgment.

3.  **Criminal Law:** HOMICIDE: PASSION.   The refusal of a person to do
    work at the request of another for whom he has agreed to do it is not
    sufficient to arouse any passion which the law will recognize as palli-
    ating the killing of such person as the result of the refusal.

4.  ———: INVOLUNTARY MANSLAUGHTER: HEAT OF PASSION.   The words
    "in the heat of passion," as applicable to involuntary manslaughter,
    mean any heat of passion recognized by law, whether produced by a
    just cause of provocation or a lawful, adequate or reasonable cause.

5.  **Murder:** MANSLAUGHTER: PASSION.   Passion aroused by provoking
    words alone accompanied by an intent to kill will not reduce a homi-
    cide to manslaughter, but, where the killing is done under the influence
    of such passion unaccompanied by an intent to take life, it is man-
    slaughter under our statute.

6.  **Criminal Practice:** SEVERAL COUNTS: VERDICT.   A verdict will
    not be disturbed on appeal because the evidence shows or tends to
    show the defendant is guilty of a higher degree of the offense than the
    one of which he was convicted.

7.  **Criminal Law:** SELF-DEFENSE.   One assaulted is justified in resist-
    ing with adequate and necessary force till he is safe if the appearances
    of danger, viewed from his standpoint, were reasonable, but the jurors
    are the final judges of the reasonableness of his apprehension.

*Appeal from Boone Circuit Court.*—HON. JOHN A.
HOCKADAY, Judge.

AFFIRMED.

*S. Turner* and *S. C. Major* for appellant.

(1) The court committed error in not sustaining the first motion to quash the indictment; it was error to permit the names of the witnesses to be indorsed thereon after it was returned into court. *State v. Roy*, 83 Mo. 268; *State v. O'Day*, 89 Mo. 559. So the second motion should have been sustained; it was not competent to permit the successor in office of the prosecuting attorney who wrote the indictment to indorse names of witnesses thereon. (2) The court erred in giving instruction, numbered 3, for the state. It was fatally defective in not submitting to the jury the question whether or not the club used was a deadly or dangerous weapon. *State v. Hoffman*, 78 Mo. 256; *State v. McDaniel*, 94 Mo. 301; *State v. Nueslein*, 25 Mo. 111; *State v. Harper*, 69 Mo. 425. (3) The court erred in giving instruction, numbered 4, for the state. In using the term, heat of passion, it was the duty of the court to explain its technical meaning. *State v. Andrews*, 76 Mo. 101. So the use of the term self-defense furnishes no guide to the jury, but leaves them to determine the law as well as the facts. *State v. Forsythe*, 89 Mo. 667. (4) The court committed error in giving instructions, numbered 7 and 14, upon the part of the state. In each of these instructions the jury are told that if they believe that defendant was in a violent passion "aroused by opprobrious epithets or abusive words." * * * Nowhere in the evidence can be found any abusive words or opprobrious epithets used by "Carlos" towards defendant. The giving of each of these instructions was error; there was no evidence in the case upon which to predicate them. *State v. Thompson*, 83 Mo. 257; *State v. Gerber*, 80 Mo. 94; *State v. Degonia*, 69 Mo. 485.

*John M. Wood*, Attorney General, for the State.

(1)   The court did not err in overruling the motion to quash the indictment.   (2)   The court gave all of the instructions prayed for by defendant, and those given on the part of the state are so fair and reasonable, and have so often been sanctioned by this court, that we do not think it will be seriously contended by appellant that they are erroneous, and do not, therefore, deem it necessary to cite cases in support of them.

THOMAS, J.—The defendant was indicted by the grand jury of Boone county in June, 1883, for murder of the first degree.   The jury before whom the case was first tried failed to agree; the second trial resulted in a conviction of murder in the second degree, and on appeal to this court the judgment was reversed and the case remanded for new trial.   92 Mo. 41.   The case was again tried in February, 1891, which resulted in conviction of manslaughter of the third degree, and defendant was sentenced to imprisonment in the penitentiary for a term of three years and the case is before this court on appeal the second time.

I.   When the jury had been impaneled at the last trial, and before the introduction of any evidence, the defendant filed his motion to quash the indictment on the ground that the names of the witnesses, upon whose testimony the indictment was found, were not indorsed on it.   The prosecuting attorney thereupon, by leave of court first obtained, indorsed the names of the witnesses on the indictment, and the motion to quash was overruled.   To this action of the court defendant duly saved his exceptions, and he now assigns it as error.   We regard it as settled that the court has authority to pursue this course, even when the names of none of the witnesses are indorsed on the indict-

ment.    *State v. Patterson*, 73 Mo. 695; *State v. Roy*, 83
Mo. 268; *State v. O'Day*, 89 Mo. 559.

There is no merit in defendant's contention that
the successor of the prosecuting attorney, who draws
and signs the indictment, cannot, by leave of court,
indorse the names of the witnesses on it.    The office of
prosecuting attorney, with its authority and power,
continues through all changes of the personnel of the
officers.

II.    Martin Carlos was a blacksmith residing in
Hallsville, Boone county, and defendant was a farmer
living in the same neighborhood.    In May, 1883,
Carlos had repaired a cultivator for defendant, warrant-
ing his work.    On the twenty-fourth day of May in
that year one of the shovels of the cultivator broke.
Defendant took the broken shovel, got on his horse
in his shirt sleeves, and went to Hallsville to have it
repaired, reaching there about three o'clock P. M.    He
found Carlos and one W. D. Hulen sitting on a box on
the front platform of a store in Hallsville.    He said:
"Carlos, here is the plow you fixed for me; it don't
give satisfaction.    I would like for you to fix it again."
Carlos answered that he had sold out his blacksmith
shop and did not have any place to work, and nothing
to fix it with.    Defendant told him he would have to fix
it and Carlos said something about some work which he
had done for him that had not been paid for.    Defend-
ant said:    "If you do not fix it I will thrash you."
Carlos said:    "Well, get down."    Defendant got off
his horse, and just as he was hitching it, Carlos rose up
and pulled his knife out of his pocket.    Defendant went
across the road, got a stick, about three feet long and
two and a half or three inches in diameter and pro-
ceeded to the platform in front of the store.    Carlos
opened his knife and had advanced to a foot or a foot
and a half of the edge of the platform by the time

defendant reached the top of the platform.   Carlos
threw up his hands, and defendant struck him with the
stick on the side of the head, and Carlos fell off the
platform and died the same evening.

One witness testified that defendant spit on his
hands, and rubbed them together before he picked up
the stick, and that he held the stick in both hands as
he advanced to the platform.

Defendant testified as follows:   "I went to Hulen's
store where I knew my wife had gone some time before.
She had my pocket-book, and I wanted to get the
money to pay for mending my plow.   When I got near
the front of the store I saw Martin Carlos on the plat-
form in front of the store.   I showed him the broken
plow, and asked him if he would not mend it; that he
had fixed it and warranted it to stand, and I had paid
him for it.   He said he had sold his shop and that he
would not mend it.   Something else was said which I
do not remember.   I told him if he would not mend it
he ought to be thrashed, or I would thrash him.   Carlos
said, 'Get down then.'   I was going into the store to see
my wife, whom I saw in there.   As I got down off my
horse my back was turned toward Carlos, and as I got
to the ground, and was hitching my horse to the awning
post, I glanced over my shoulder and saw Carlos had
risen up off a box on which he was sitting, and had a
knife in his hand.   I did not certainly know, at the time,
what sort of a weapon it was.   When I saw this, I went
out, may be ten or fifteen feet, and picked up this stick
here in court; it was the first thing I saw.   I then
returned towards the east end of the platform to go into
the store.   When I got close to the bottom step Carlos
had advanced from the south side to the east end of
the platform, intercepting my way into the store door.
He had the weapon drawn and was threatening me with
it; I drew up the stick in my hands and struck him on

the head.   He fell forwards toward me; he was moving towards me when I struck him.   Before I got off my horse I had thrown the plow on the platform, or handed it to Hulen, I don't know which.   I made no attempt to get the stick until I saw the knife in Carlos' hands.''

The court, by its instructions, authorized the jury to find defendant guilty of murder of the first or second degree, or of manslaughter of the third or fourth degree, or acquit him on the ground of self-defense. As the defendant was found guilty of manslaughter of the third degree, it is not necessary for us to examine the objections urged to the instructions defining murder of the second degree. The court, among others, gave the following instruction: ''If the jury believe from the evidence, beyond a reasonable doubt, that defendant killed deceased with a large club, about three and one-half feet in length, and three inches in diameter, and that the same was a dangerous weapon, in a heat of passion and without a design to kill him, they will find him guilty of manslaughter in the third degree, unless they further find from the evidence that such killing was done in self-defense, in which event they will find him not guilty.''

Two specific objections are urged to this instruction.   The first one is that it does not define ''heat of passion,'' and the jury was left to grope in the dark as to the meaning of these words.   By the seventh instruction, given on behalf of the state, the court told the jury that ''although the defendant struck and killed Carlos while the defendant was in a violent passion, suddenly aroused by opprobrious epithets or abusive words spoken to him by Carlos or by drawing his knife,   *   *   *   yet if such striking and killing was done wilfully, premeditatedly and of his malice aforethought, as heretofore explained, the defendant was guilty of murder in the second degree,'' and by the

fourteenth instruction the jury was told that if they believed "from the evidence that defendant struck and killed Carlos while the defendant was in a violent passion, suddenly aroused by reason of Carlos having used offensive language toward him, or by refusing to mend his plow or by drawing his knife, you cannot find him guilty of murder in any degree, for in that case the law presumes that such striking and killing was not done of defendant's malice but by reason of such passion; on the other hand, although you may believe that the defendant struck and killed Carlos while in a violent passion, suddenly aroused from the causes hereinbefore set out, yet if you shall further believe, from the evidence, that such striking and killing was not done in self-defense as hereinafter explained, you will find him guilty of manslaughter in the fourth degree."

These are the only instructions given that informed the jury what that passion is, which mitigates a homicide, and the defendant insists that these ought not to have been given upon the ground that there was no evidence in the case upon which to predicate them; that there was no evidence of opprobrious epithets or abusive words uttered by deceased towards defendant. If this position be well founded, we cannot perceive how the instructions could have injured defendant. If the instructions had any effect upon the minds of the jurors, it must have been favorable to defendant, as indicating that deceased had applied opprobrious epithets to defendant or used abusive language towards him when he had not, in fact, done so. But the court virtually told the jury that deceased's refusal to mend the cultivator or the drawing of his knife might be sufficient to arouse defendant's passion so as to mitigate the homicide. The court here evidently went to the extreme verge of the law in favor of defendant.

We cannot sanction the doctrine that the simple refusal to perform work for a man upon demand is sufficient to arouse any passion, recognized in law, that will palliate crime.     But defendant has no right to complain of an error committed in his favor.

When this case was here on the former appeal this court said:     "An instruction should have been given in relation to a lower grade of homicide than murder in the second degree.     The evidence tends to show that the killing was the result of a sudden quarrel. This would furnish basis for such an instruction." What grades of homicide, lower than murder of the second degree, should have been presented to the jury, this court did not undertake to designate, and the lower court on a retrial, having authorized the jury to convict defendant of manslaughter of the third or fourth degree, and the jury having found him guilty of manslaughter of the third degree, it remains for us to determine whether the instructions and the verdict under them, were justified by the evidence.

The various degrees of homicide have been a fruitful source of discussion in the courts for centuries and especially in Missouri during the last twenty-five years.     It is conceded on all hands that the distinction in the degrees of homicide is based on intent and provocation as characterizing intent.     In the cases of *State v. Wieners*, 66 Mo. 13; *State v. Ellis*, 74 Mo. 207, and *State v. O'Hara*, 92 Mo. 59, this court has so clearly defined the *criteria* of murder of the first and second degrees, that the bench and bar have found but little difficulty in the application of the law to those grades of homicide, but upon a re-examination of the subject we confess we find much ambiguity in regard to the distinguishing characteristics of manslaughter of the various degrees.     This is the result of a failure to constantly keep in mind the distinction between a wilful

and an involuntary homicide.   In the *Ellis case, supra,* Judge HOUGH, speaking for the court, said:   "The passion or excitement of mind spoken of in the *Curtis case,* in defining murder in the second degree, is the passion spoken of in the books; that state of mind, which, when produced by *lawful* provocation, will reduce the homicide to manslaughter."    And then the learned judge goes on to show what a lawful provocation is; that it means a provocation amounting to an assault or personal violence with a few exceptions, one of which is the detection, by the husband, of another in the act of adultery with his wife.

This court, in the construction of the sections of our. statutes defining the two degrees of murder, adopted a rule in accord with the dictates of humanity, in holding that excitement of mind produced by opprobrious epithets or abusive language may reduce the grade of a homicide from murder of the first to murder of the second degree, and to distinguish the two degrees of passion it has designated that provocation producing passion, which reduces the homicide to murder of the second degree, as just, while it designated that provocation, producing passion, that will reduce a homicide to manslaughter, as lawful, reasonable or adequate. In *Bulling's case,* 105 Mo. 204, we said:   " When our statute uses the words, heat of passion, in the definition of the various degrees of manslaughter it evidently intends to use them in their common-law sense; that is, such heat of passion as is produced by a lawful provocation."   The language used in some of the former opinions of the court would seem to justify that construction, but we now think this view is erroneous. We fell into the error by inattention to the use of general terms employed in the former opinions of this court.   After a thorough examination of the subject we

feel satisfied now that the words " heat of passion," as used in the sections of the statute defining involuntary manslaughter, mean any heat of passion recognized by law, whether produced by what is denominated a just cause of provocation or by what is denominated a lawful, adequate or reasonable cause of provocation.

When the courts say that nothing short of *lawful* provocation will reduce a homicide to manslaughter we must keep in mind that an *intentional* homicide is meant. "When the evidence shows an intent on the part of the defendant to kill no words of reproach, no matter how grievous soever, are provocation sufficient to free the party killing from the guilt of murder; nor are indecent, provoking actions or gestures expressive of contempt or reproach without an assault upon the person." Wharton on Homicide [2 Ed.] sec. 393.

Here Mr. Wharton specifically limits the application of the rule to cases where there exists an intent to kill. Passion aroused by provoking words alone, accompanied by an intent to kill, will not reduce the homicide to manslaughter, but where the killing is done under the influence of such passion, unaccompanied by an intent to take life, it is manslaughter under our statute. This is manifest from another consideration, and that is, that an intention to kill, either express or implied, is essential to constitute murder, except where death result in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem; and, hence, the intent to kill being absent, the homicide, with the exceptions named, must be manslaughter without regard to whether the "heat of passion" is produced by a just or lawful cause of provocation. What we said in the *Bulling case* will apply strictly to *voluntary* homicide; in which case the provocation must be what is termed lawful, reasonable or

adequate, and these terms, as qualifying adjectives of provocation, are synonymous.

The New York statute is substantially in the same language as ours, and in *Wilson v. The People*, 4 Park. Cr. Rep. 619, it was held by the supreme court of that state that the heat of passion mentioned in the statutory definition of involuntary manslaughter affords the intended protection to the accused whether it was produced by acts or words, if the provocation was such as was naturally calculated to produce it.

Applying these principles we have no difficulty in solving the questions presented by this record. The jury must have found, under the instructions of the court, that the defendant did not intend to kill Carlos when he struck him with the stick, and that he did not act in self-defense. These facts being found, and his punishment being fixed upon the theory that he committed the homicide in a heat of passion, the defendant certainly ought not to be heard to complain that there was no sufficient cause of provocation, either just or lawful, to produce any passion or excitement of mind. If his passion was in fact aroused when there was no cause for it that the law can recognize the jury gave him the benefit of it to the same extent as if aroused by a cause recognized by law, and in that case he has no right to complain. If his passion was not aroused but he acted in cold blood, in contemplation of law, then he was guilty of a higher grade of homicide, and in that case he has no just cause of complaint. A verdict will not be disturbed because "the evidence shows or tends to show the defendant to be guilty of a higher degree of the offense than that of which he is convicted." R. S. 1889, sec. 4115; *State v. Wagner*, 78 Mo. 644; *State v. Keeland*, 90 Mo. 337; *State v. Lowe*, 93 Mo. 547.

The second objection to the instruction defining manslaughter of the third degree, is that it fails to define self-defense. This objection cannot be sustained. The instructions must be taken as a whole, and the court in other instructions did define what it takes to constitute self-defense.

The court committed no error in instructing the jury that they could not acquit defendant on the ground of self-defense, if, at the time he struck the fatal blow, he did not have reasonable cause to apprehend great personal injury to himself from deceased, though he thought he was in danger. The court fully and clearly instructed the jury that the danger need not have been real or actual, but that defendant had a right to act on reasonable appearances in the defense of his person. If the appearances of danger, viewed from defendant's standpoint, were reasonable he was justified in resisting with adequate and necessary force till he was safe, but the jurors, and not he, were the final judges of the reasonableness of his apprehension. *State v. Parker*, 106 Mo. 217.

The defendant had a fair trial throughout, and we think the verdict of the jury was tempered with mercy, and it ought not to be disturbed. The judgment is accordingly affirmed. All concur.